BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
fbottini@bottinilaw.com
Albert Y. Chang (296065)
achang@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DINO DIBLASIO, derivatively on behalf of Green Dot Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN W. STREIT, MARK SHIFKE, JEFFREY B. OSHER, ELLEN RICHEY, WILLIAM I. JACOBS, J. CHRIS BREWSTER, RAJEEV V. DATE, SATURNINO FANLO, DAN R. HENRY, GLINDA BRIDGFORTH HODGES, GEORGE T. SHAHEEN, and GEORGE W. GRESHAM,<br><br>Defendants,<br><br>and<br><br>GREEN DOT CORPORATION,<br><br>Nominal Defendant. | Case No. 2:24-cv-05924-DDP-Ex<br><br>**VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**1. Breaches of Fiduciary Duties;**<br>**2. Abuse of Control;**<br>**3. Unjust Enrichment; and**<br>**4. Violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9.**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Dino DiBlasio ("Plaintiff"), derivatively on behalf of Green Dot Corporation (hereafter "Green Dot" or the "Company"), submits this Verified First Amended Shareholder Derivative Complaint against the members of the Company's Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, abuse of control, unjust enrichment, and violations of the federal securities laws. Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about Green Dot, and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This is a shareholder derivative action to remedy the wrongdoing committed by Green Dot's directors and officers between January 1, 2017 and the present (the "Relevant Period").

2. Green Dot is a corporation headquartered in Los Angeles which sells high-fee, prepaid debit cards ("legacy prepaid" cards) to lower-income Americans who lack access to a personal bank account. By 2018, it was apparent to Green Dot's senior insiders that sales of the Company's "bread and butter" legacy prepaid cards were faltering.

3. During the Relevant Period, the Company's officers and directors breached their fiduciary duties of candor and loyalty by repeatedly causing the Company to make misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts. Choosing to speak

about the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts, Defendants misled investors by concealing critical information about Green Dot's declining core prepaid debit card business, which generated the largest portion of Green Dot's revenue. Green Dot's former CEO and CFO also obfuscated Green Dot's account and fee losses by intentionally conflating active accounts, high-fee legacy prepaid accounts, low- to no-fee direct-deposit accounts, and low- to no-fee digital accounts (Banking as a Service ("BaaS") accounts). In doing so, ***Defendants Streit and Shifke inflated Green Dot's stock price long enough to sell $62 million dollars of their own Green Dot shares at artificially inflated prices.***

4. Some of the adverse information concealed by Defendants gradually began to emerge, though Defendants continued to hide the full truth. The Director Defendants continued to misrepresent the status of the Company's internal controls to investors, and continued to conceal the fact that, ***since 2017, the Company has lacked effective consumer protection and anti-money laundering controls***. ***On or about February 27, 2024, Green Dot disclosed in a Form 8-K that it faces up to $50 million in liabilities as a result of violations it engaged in since 2017***, and has already accrued a $20 million liability on its financial statements for the year ended December 31, 2023 for the monetary fines in a proposed consent order with the Federal Reserve Board. In its Form 10-K Annual Report dated Feb. 29, 2024, Green Dot disclosed that "we and our subsidiary bank received a proposed consent order from the Federal Reserve Board relating principally to various aspects of compliance risk management, including consumer compliance and compliance with AML regulations. The proposed consent order includes proposals for civil money penalties related to these issues and while the amount of any monetary penalty and the nature of any other relief the Federal Reserve Board may seek to obtain from us have not yet been determined, ***we have accrued an estimated liability of $20 million related to***

***the proposed consent order during the three months ended December 31, 2023 and estimate that the aggregate range of reasonably possible losses is up to $50 million as of December 31, 2023.***"[1]

5. Then, on July 31, 2024, it was reported that Green Dot had agreed to pay $44 million to the Federal Reserve to resolve the proposed consent decree and allegations that it engaged in unfair, or deceptive acts or practices (UDAP).

6. As a result, the Company has been subjected to significant losses, expenses, costs, and harm. This shareholder derivative suit is brought to recoup the losses suffered by the Company as a result of the Individual Defendants' breaches of fiduciary duties.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder. The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8. Venue is proper in the Central District of California under 28 U.S.C. §§ 1391 and 1401 because Green Dot maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein occurred in this District.

9. Each defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on Green Dot's business, or have authorized acts and actions that have had a sufficient impact in this District or on Green Dot's shareholders and investors residing here to justify the exercise of jurisdiction over them.

/ / /

/ / /

[1] *See* Form 10-K Annual Report dated Feb. 29, 2024, at p. 22.

## III. PARTIES

### A. Plaintiff

10. Plaintiff Dino DiBlasio is a current shareholder of Green Dot and has continuously held his stock since at least 2019.

### B. Nominal Defendant

11. Nominal Defendant Green Dot Corporation is a Delaware company headquartered and operating at 3465 East Foothill Boulevard, Pasadena, California at all relevant times. The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GDOT." Green Dot is a citizen of California and Delaware.

### C. The Individual Defendants

12. Defendant Steven W. Streit ("Streit") founded Green Dot and was its CEO from 2001 until December 2019. Streit also served as a Director and President of Green Dot from October 1999 until December 2019. Streit is a citizen of California.

13. Defendant Mark Shifke ("Shifke") was CFO of Green Dot from 2015 until December 2019. Prior to assuming the CFO role, Shifke was Green Dot's Senior Vice President of Corporate Strategy and M&A. Shifke is a citizen of California.

14. Defendant Jeffrey B. Osher ("Osher") was a Director of the Company from March 2020 until July 31, 2023. He served as a member of the Audit Committee and the Nominating and Corporate Governance Committee until his resignation on July 31, 2023.

15. Defendant Ellen Richey ("Richey") has been a Director of the Company from April 2020 until the present. She has served as a member of the Risk Committee and Nominating and Corporate Governance Committee. Green Dot's website touts Richey's experience in risk management, citing her prior work for Visa in such field. Richey is a citizen of California.

16. Defendant William I. Jacobs ("Jacobs") is a member of the Board of

Directors, as well as the Board's current Chairman, and has served as a director of the Company since April 2016. He served as interim CEO of the Company from December 2019 until March 2020, when the Company named Dan Henry as CEO. Jacobs is a member of the Compensation Committee and Nominating and Corporate Governance Committee.

17. Defendant J. Chris Brewster ("Brewster") has served as a director of the Company from April 2016 to the present. He served as interim President from December 2019 until 2020. Brewster has been a member of the Company's Audit Committee and a member of the Risk Committee.

18. Defendant Rajeev V. Date ("Date") served as a director of the Company from April 2016 until December 31, 2023. Date also served as a member of the Board's Risk Committee and Nominating and Corporate Governance Committee.

19. Defendant Saturnino Fanlo ("Fanlo") has served as a director of the Company from May 2016 to the present. Fanlo is a member of the Audit and Compensation Committees.

20. Defendant Dan R. Henry ("Henry") served as Green Dot's President and CEO and a Director of the Company from March 2020 until October 2022.

21. Defendant Glinda Bridgforth Hodges ("Hodges") served as a director of the Company from December 2014 to October 1, 2022 and was a member of the Nominating and Corporate Governance Committee.

22. Defendant George T. Shaheen ("Shaheen") has served as a director of the Company from September 2013 to the present. Shaheen is a member of the Audit Committee and Nominating and Corporate Governance Committee.

23. Defendant George W. Gresham ("Gresham") has served as CFO and COO and on the Company's board of directors since October 2021. He previously served on the boards of both Green Dot Corporation and Green Dot Bank from 2016 to 2019, and as CFO at NetSpend Holdings from 2010 to 2013.

24. The Defendants referenced in ¶¶ 12-23 are sometimes referred to herein, collectively, as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Green Dot's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

25. Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or

recklessly disregarded was materially false and misleading.

## IV. THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A. General Duties as Directors and Officers

26. By reason of their positions as Green Dot's officers and directors and because of their ability to control Green Dot's business and corporate affairs, the Individual Defendants owed Green Dot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Green Dot in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Green Dot and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27. Each director and officer owes to Green Dot and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of Green Dot's affairs and in the use and preservation of its property and assets.

28. The Individual Defendants, because of their positions of control and authority as directors and officers of Green Dot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained herein.

29. To discharge their duties, the Individual Defendants, as Green Dot's officers and directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

(a) ensure that Green Dot was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States;

(b) conduct the affairs of the Company in an efficient,

business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Green Dot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Green Dot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Green Dot's operations would comply with all laws and its financial statements filed with the SEC and disseminated to the public and Green Dot's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

30. Each Individual Defendant, by virtue of his or her position as a director

or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Individual Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as Green Dot's directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Green Dot's Board at all relevant times.

31. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

32. At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

/ / /

**B. Compliance with the Generally Accepted Accounting Principles**

33. In issuing its financial statements, Green Dot was required to comply with the Generally Accepted Accounting Principles ("GAAP") — a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

34. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. § 210.10-01(a).

35. During the Relevant Period, Green Dot stated in its annual reports on Forms 10-K that its financial statements were prepared in accordance with accounting principles generally accepted in the United States of America.

36. In reality, however, the Individual Defendants failed to ensure that Green Dot adhered to GAAP during the Relevant Period and failed to cause the Company to adopt and implement adequate internal controls.

**C. The Duty of Reasonable and Prudent Supervision**

37. The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Individual Defendants are required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e) remain informed as to how Green Dot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f) ensure that Green Dot was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V. BREACHES OF FIDUCIARY DUTIES

38. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Green Dot and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Green Dot, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Green Dot, the absence of good faith on their part, or a reckless disregard

for their duties to Green Dot and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Green Dot.

39. The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(a) the Company's executives, including Defendants Streit, Shifke, and Henry, were causing the Company to misrepresent its financial condition and operations and making misleading statements concerning the value of Green Dot's prepaid customers and business, the scope of the decline in its prepaid business, and the effect of and reason for its shift to digital and direct deposit accounts;

(b) the Individual Defendants had misled investors by concealing critical information about Green Dot's declining core prepaid debit card business, which generated the largest portion of Green Dot's revenue. Green Dot's former CEO and CFO also obfuscated Green Dot's account and fee losses by conflating active accounts, high-fee legacy prepaid accounts, low- to no-fee direct-deposit accounts, and low- to no-fee digital accounts (Banking as a Service ("BaaS") accounts). In doing so, Defendants Streit and Shifke inflated Green Dot's stock price long enough to sell $62 million dollars of their own Green Dot shares at artificially inflated prices;

(c) the Director Directors have also concealed the Company's faulty consumer protection and anti-money laundering practices from investors from 2017 to Feb. 27, 2024. On or about February 27, 2024, Green Dot first disclosed that it faces up to $50 million in liabilities as a result of violations it engaged in. In a Form 8-K filed on February 27, 2024, Green Dot first disclosed that it had received a proposed consent

order from the Federal Reserve Board due to violation of consumer and anti-money laundering laws, and that it had already accrued liabilities of $20 million on its financial statements for the year ended December 31, 2024. Then, two days later in its Form 10-K Annual Report dated Feb. 29, 2024, Green Dot disclosed that "we and our subsidiary bank received a proposed consent order from the Federal Reserve Board relating principally to various aspects of compliance risk management, including consumer compliance and compliance with AML regulations. The proposed consent order includes proposals for civil money penalties related to these issues and while the amount of any monetary penalty and the nature of any other relief the Federal Reserve Board may seek to obtain from us have not yet been determined, we have accrued an estimated liability of $20 million related to the proposed consent order during the three months ended December 31, 2023 and estimate that the aggregate range of reasonably possible losses is up to $50 million as of December 31, 2023."

(d) the Company's financial statements were not prepared in accordance with GAAP;

(e) the Company lacked adequate internal controls and lacked the controls necessary to ensure compliance with federal laws and regulations, including consumer compliance laws and anti-money laundering laws, and/or that the Company's executives were intentionally overriding the controls that existed; and

(f) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

40. In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of a securities class action lawsuit that

alleges violations of federal securities laws, which lawsuit has already survived a motion to dismiss. As a result, Green Dot has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI. CONTROL, ACCESS, AND AUTHORITY

41. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Green Dot.

42. Because of their advisory, executive, managerial, and directorial positions with Green Dot, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Green Dot.

43. Each of the Individual Defendants was the agent of each of the other Defendants and of Green Dot, and was at all times acting within the course and scope of such agency.

## VII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company was misrepresenting its financial results and effectiveness of the Company's internal controls to the public; (b) that since 2017, the Company has lacked effective consumer protection and anti-money laundering controls, thereby exposing the Company to significant fines and penalties; (c) as a result, the Company's

business model was premised on violations of consumer and anti-money laundering laws; (d) as a result, Green Dot's revenues and financial results were overstated; (e) the Company's financial statements were not prepared in accordance with GAAP; (f) the Company lacked adequate internal and financial controls; and (g) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

46. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue false or misleading financial statements that failed to disclose the Company's inadequate internal controls and violations of law.

47. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (b) disguise and misrepresent the Company's future business prospects; and (c) allow Defendants Streit and Shifke to sell $62 million dollars of their own Green Dot shares at artificially inflated prices.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49. Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially

assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII. FACTUAL ALLEGATIONS

### A. Green Dot's Debit Card Business

50. Green Dot is perhaps best known for partnering with Walmart to provide basic digital banking services to customers.

51. Green Dot's legacy prepaid cards have historically been sold to lower-income customers who lack access to a personal bank account. Defendants referred to this target group as the "unbanked" and "underbanked."

52. Green Dot is the world's largest prepaid debit card company. Its high-fee, prepaid products are sold at nearly 100,000 retail stores, including at CVS, Rite Aid, Walgreens, Dollar Tree, with discounted offerings at Walmart and Meijer, and it sells co-branded cards with Walmart, Boost Mobile, AT&T and Citibank. Green Dot also operates a BaaS platform for consumer and technology companies.

53. Green Dot's legacy prepaid cards are debit cards, not lines of credit. A user loads money onto a card and subsequent purchases are then deducted from the stored balance. For a fee, the user can add more money to the card (called "reloading") by paying cash at a retailer or from their paycheck.

54. Leading up to 2019, revenue from legacy prepaid cards was Green Dot's core "bread-and-butter" business. As analysts at The Street noted in 2014, "Green Dot's bread and butter is made up of lower-income and lower- credit consumers who have historically operated outside of the country's banking system." At the time Green Dot went public, over 75% of its revenue was legacy prepaid-related: 50.8% from new card, maintenance, ATM, and other fees; and 26.6% from cash transfer revenues. Green Dot's 2017 Form 10-K likewise stated that most of the Company's operating

revenues "derived from prepaid financial services sold at our four largest retail distributors" and that operating revenue derived from products and services sold at Walmart store locations "was approximately 40%." Streit underscored the significance of prepaid cards to Green Dot's overall operations in a February 21, 2018 earnings call, emphasizing that "our bread and butter from the old days is still our bread and butter today."

55. Green Dot's legacy prepaid cards are extremely lucrative, as they generate high fees that traditional credit and debit cards do not, do not require interest to be paid to consumers on card balances, and lack basic consumer protections that apply to traditional credit and debit cards. As a result, however, this core component of Green Dot's business model is particularly vulnerable to less-exploitive alternatives for the same customers, and former CEO Streit built Green Dot and his personal fortune by identifying and targeting unbanked and underbanked Americans. As Streit said on the Company's May 9, 2018 earnings call:

> [W]hen we first launched the company, if you think back to the IPO in 2010, we thought the TAM [total addressable market], we described as and unbanked American families. We said they were 60 million adults, I think is what the quote was, or the number was at that time, and we got that number from one of the federal agencies.

56. Before founding Green Dot, Streit was a radio DJ who went by the moniker "Ayatollah of Rock 'n' Rolla." As Streit told *Forbes* in 2011, when he and his first investor, Shifke, got started: "'We didn't have a product. We didn't have a bank. We didn't have a contract to give them.'"

57. But by 2018, Green Dot was earning $1 billion annually targeting the unbanked and underbanked, with the bulk of the revenue from its legacy prepaid card fees. Green Dot's Prepaid Visa Card, for example, was widely available at retailers, including Walmart, 7-Eleven, CVS/Pharmacy, and Dollar Tree in 2018 and 2019 and

users are charged, among other fees: a $1.95 purchase/activation fee; a $7.95 monthly fee; a $2.50 ATM fee; and a cash reload fee up to $4.95. All told, the fees exceeded $35 per month for 20 purchases. By comparison, the average monthly fee for a low-balance checking account in 2018 was around $10.

58. The Company's legacy prepaid cards were a "high-margin" product, retaining (or re-upping) debit-card customers for additional monthly and reloading fees was critical to maintaining Green Dot's high margins and profitability.

59. Given the importance of legacy prepaid card fees to Green Dot's business model, investors were laser focused on the growth of this core business. Investment analysts recognized this, noting that "the company's core business is still a prepaid card issuer focused on unbanked/underbanked market segment" (February 21, 2018 Deutsche Bank analyst report) and that "underserved customers spent nearly $175B in and interest in 2016 across all products" (July 10, 2018 Jefferies analyst report).

### B. The Individual Defendants Caused the Company to Make False and Misleading Statements to the Market in 2017

60. During 2017, the Individual Defendants told the stock market that the Company was well-poised for further growth, emphasizing Green Dot's growth in the legacy prepaid card business.

61. For example, Green Dot's Q2 2017 Form 10-Q highlighted the acquisition of a company called UniRush as incremental to its existing legacy prepaid business, citing increasing revenue from prepaid cards, the cards' improved unit economics, and increased prepaid card fees:

> "We believe this increase in revenue reflects the increasing quality of customers within our active card base and improved unit economics on our suite of prepaid card products, which increased monthly maintenance fees and ATM fees earned within our Account Services

segment."

62. However, the Individual Defendants concealed the fact that the Company lacked effective internal controls over consumer and anti-money laundering laws and regulations, and that the lack of such effective controls (as more fully detailed *infra*) risked acquisitions like UniRush (and the revenue associated with them) due to the fact that the Company was regulated by the Federal Reserve Board, which heavily scrutinizes such acquisitions and retains the power to block such mergers due to failure of companies like Green Dot to maintain effective internal controls.

63. Rather than disclosing known, then-existing material deficiencies in the Company's internal controls over compliance with consumer protection and anti-money-laundering laws, the Company's Q2 2017 Form 10-Q concealed such deficiencies and only warned of "possible" violations in a boilerplate disclosure that the Company continued to use for at least seven years in the future, until it was finally forced by the Federal Reserve Board on February 27, 2024 to admit to such deficiencies. The Form 10-Q stated:

> We operate in a highly regulated environment, and failure by us, the banks that issue our cards or the businesses that participate in our reload network to comply with the laws and regulations to which we are subject could negatively impact our business. We are subject to state money transmission licensing requirements and a wide range of federal and other state laws and regulations. ***In particular, our products and services are subject to an increasingly strict set of legal and regulatory requirements intended to protect consumers and to help detect and prevent money laundering***, terrorist financing and other illicit activities.
>
> Many of these laws and regulations are evolving, unclear and inconsistent across various jurisdictions, and ensuring compliance with them is

> difficult and costly. For example, ***with increasing frequency, federal and state regulators are holding businesses like ours to higher standards of training, monitoring and compliance, including monitoring for possible violations of laws by the businesses that participate in our reload network. Failure by us or those businesses to comply with the laws and regulations to which we are or may become subject could result in fines, penalties or limitations on our ability to conduct our business, or federal or state actions,*** any of the network participants, banks that issue our cards and regulators, and could materially and ***adversely affect our business, operating results and financial condition***.

64. This particular boilerplate disclosure was particularly misleading in that Green Dot not only used the generic "warning" for seven years, but also couched the warning in language stating that the laws and regulatory scrutiny applied to "***businesses like ours"*** and that "Failure by us ***or those businesses to comply with the laws and regulations"*** could result in fines, penalties or limitations, thus misleading investors into believing that the risks faced by Green Dot were the same as every other business in its field and that future fines and penalties were only theoretical and speculative, while concealing Green Dot's actual, already-existing deficiencies in internal controls.

65. The Q2 2017 Form 10-Q also contained SOX certifications from both Streit and Shifke regarding the Company's internal controls that misrepresented that:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting,

to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

66. On Green Dot's August 8, 2017 earnings call, Defendant Streit told investors that Green Dot "continue[d] to create and sell more of [their] own products that increasingly appeal[ed] to a more committed and more profitable customer base."

67. Streit also said the Company's "old legacy [prepaid card] customers deliver[ed] a lot of revenue, because these are your best customers," telling investors that the newer prepaid products had even "better fees and generating more natural usage revenue and that's why you're seeing this continuing increased revenue per card holder." Streit said the Green Dot prepaid cards were "continuing to spin the wheel of synergy and revenue on top of a lower cost base."

68. On the November 7, 2017 earnings call, Streit again emphasized "solid growth across our enterprise, especially from our prepaid business lines." Streit stressed the health of Green Dot's legacy prepaid business, citing "momentum we're seeing in the retail demand for our products" and "retail demand for our products" at Walmart was driving "revenue growth 33% year-over-year for the consumer accounts segment."

69. In response to a question from an analyst, Streit said "retention is showing up in that active card growth" and told investors to "expect that trend to continue into next year where you're going to see active card growth continue at some pace."

70. Defendant Streit was Green Dot's co-founder and was a very hands-on CEO, to the point of micromanagement. For example, he participated in weekly financial planning meetings and was aware of year-over-year declines in Green Dot's prepaid accounts (excluding acquisitions) during the Class Period, as reflected on near-real-time basis in Customer Relationship Management Reports, which Streit and Shifke received (the declining growth rate for these "home grown" legacy prepaid accounts began from mid-2017 to early 2018). By late 2017, Green Dot's home-grown products, including its significant Walmart offerings, were declining at a steady pace and this continued throughout 2018 due to declines in both daily active card activity and numbers of cards sold. By 2018, the Company was projecting flat active account growth, despite growth in BaaS. Green Dot was losing legacy prepaid customers, in part, due to competition from cheap digital alternatives such as Chime, Venmo, Netspend and a Square product/service called "Cash."

71. Other reports to which Streit and Shifke had free access reflected this grim performance and outlook, including the BIA dashboard, Financial Key Metrics, the Cohort Report, the Tableau Report, and the Revenue Pacing Report, as well as Consolidated Activity Reports ("CARs"), which the finance department (headed by Shifke) generated to reflect current and projected customer bases for the Company's product lines. CARs included active customer base numbers broken down into client portfolios, including current numbers, historical numbers, and projections. Like Streit, Shifke also adopted a hands-on management approach. Both regularly reviewed all performance and forecasting metrics, including those for the failing legacy prepaid cards, and were intimately involved in marketing, which provided additional insight

into Green Dot's decaying "bread and butter" legacy prepaid business. For example, Streit ended a marketing campaign in August 2018 after concluding that it was not attracting enough new customers to overcome significant drop-offs in new customer acquisitions.

72. Because of the Company's struggles to grow its own customer base, Green Dot had purchased several regional card companies to show growth, with an estimated 40%-50% of customers obtained through acquisition. But by 2018, this well had run dry (actually, Defendants' acquisitions had largely drained it).

73. Desperate to stop the account bleed, Streit personally halted the efforts of Green Dot's Fraud Management team to tighten loose customer identification procedures, also known as onboarding rules. To avoid losing more accounts, Streit forced Green Dot employees to accept an account base that was rife with fraud and made change recommendations to Customer Identification Procedures that influenced higher account-approval rates and aggravated a situation in which 30%-40% of accounts had some sort of negative status (*e.g.*, unmatched address or name, excessive disputes, and/or negative balance). At times, various individual customers could each have hundreds of accounts; one customer reached 1,000 accounts.

74. In sum, by early 2018, Defendants knew: (i) the growth of the legacy prepaid card business was declining; (ii) the Company was facing existential competition from new low-fee digital banking; and (iii) that upon acquiring UniRush, the Company could no longer use acquisitions to hide declining growth in legacy prepaid cards. Seasonal bumps from Green Dot's tax business and the last gasps of growth from prior acquisitions had allowed Defendants to conceal declining growth in the legacy prepaid card business in the short term, but Defendants knew this mirage could not last.

75. By early 2018, the Individual Defendants were also aware that the Company lacked adequate internal controls over consumer and anti-laundering laws,

yet concealed such information from the market.

76. Between May 2018 and November 2019, Defendants misled investors about declining growth in Green Dot's legacy prepaid debit card business and diverted investor attention from this "bread and butter" product to BaaS and direct-deposit accounts, even though the vast majority of such accounts were offered with no fees. And Defendants concealed the reasons for their new emphasis, which included the declining performance of the legacy prepaid cards and new competition from much less expensive digital alternatives, such as PayPal, Venmo, and neobanks like Chime.

77. By 2019, Defendants could no longer entirely obscure the declining growth in the legacy prepaid card business. Instead of being truthful with investors, however, Defendants changed tactics by understating the importance of the legacy prepaid business and overstating the value of new digital and direct deposit products.

**C. Defendants' May 2018 False Statements**

78. During the May 9, 2018 earnings call, Streit and Shifke emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner, as they omitted critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest margin portion of its revenues but its growth rate was shrinking, which would inevitably impact the Company's bottom line. Yet, Defendant Streit discussed the momentum of Green Dot's business, including Green Dot's legacy prepaid cards, stating:

(a) "On the branded side of our shop, Green Dot continues to gain traction on nearly all fronts."

(b) "Additionally, Green Dot has earned more than 5,000 new incremental shelf facings for its products and services at Safeway Albertson stores and other locations where Green Dot now occupies space formerly occupied by the now defunct American Express prepaid product line."

(c) "Walmart MoneyCards and Green Dot classic Visa cards and MasterCards and GoBank . . . ***continue[] to do extremely well*** " and "I think we still have a ***long way to go*** before we come anywhere near what you'd call maxed out."

(d) "We don't intend to imply that we see a slowdown forthcoming. **In fact, as both Steve and I mentioned in our remarks, we feel upbeat about the likelihood of *continued strong momentum*."**

79. Streit's May 9, 2018 statements regarding the momentum of Green Dot's business were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded included the following:

(a) Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(b) Despite 5,000 new shelf facings, Green Dot was losing traction on its most important front (*i.e.*, its legacy prepaid cards).

(c) The growth rate of Green Dot's legacy, high-margin prepaid was already declining and would inevitably impact the Company's bottom line.

80. Streit also made the following statements during the May 9, 2018 conference call concerning Green Dot's product mix and account value:

(a) "The continuing long-term portfolio mix shift towards higher lifetime value accounts helped push the Account Services gross dollar volume or GDV flowing through our various Account Services products up by 57% year-over- year to more than $11.7 billion, setting another new record for our company."

(b) "[A]ttracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself. Specifically, we have previously shared that a direct deposit customer

typically has a meaningfully higher lifetime value than accounts that do not receive direct deposit."

(c) "In our Account Services segment on a consolidated basis, total active accounts increased for the fifth consecutive quarter, growing by 21% year-over- year or an additional nearly 1 million more active accounts year-over-year, totaling 6 million active accounts in the quarter, a new record for Green Dot."

(d) "Step 1 was to continue to grow the number of active accounts year-over year and to improve the unit economics of those accounts. [W]e are well ahead on this goal, having added nearly 1 million new active accounts while increasing the number of accounts receiving direct deposit by 930,000."

(e) "So we're not seeing any competitive pressure, and you can see the growth is pretty robust. And we like the fact that there's more and more digital offerings because customers don't see the world as a net zero-sum game . . . So the answer is no, we're not feeling competitive pressure from any of those . . ."

81. Defendant Streit's May 9, 2018 statements concerning Green Dot's product mix and value were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that:

(a) Competition from new low-fee or no-fee digital products was forcing Green Dot to shift from high-fee legacy prepaid cards to largely free products.

(b) The claimed increase in "GDV" (total card-loaded funds) masked a less-lucrative product-mix trend.

(c) Direct-deposit accounts were not generating the high-margin card fees of legacy prepaid accounts.

(d) The "vast majority" of the direct deposit and BaaS accounts were free.

(e) The only "revenue stream that would be enhanced" by direct deposit accounts was "from interchange," which was extremely low-margin.

(f) That as a result of (a)-(e) above, the per-unit economics of Green Dot's active accounts was part of a product-mix trend that was reversing card- revenue-and-fee-growth and would inevitably impact the Company's bottom line.

82. During the May 9, 2018 earnings call, Shifke further stated, "[a]ll told, in the quarter, we attracted more highly engaged customers than ever before with better unit economics, as evidenced by the record interchange and fee revenue."

83. Defendant Shifke's May 9, 2018 statement was misleading when made. The true facts, which Defendants knew and/or recklessly disregarded were that the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that had reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. Moreover, behind the increase in overall active accounts was a product-mix trend that was reversing card-revenue-and-fee growth and would inevitably impact the Company's bottom line.

84. Defendants' statements had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, Jefferies issued a May 9, 2018 report emphasizing Green Dot's "solid fundamentals" in its "core business," noting that "guidance was raised on the back of strong Q1 results" and emphasizing the "momentum in the core business." SunTrust Robinson Humphrey ("SunTrust") issued a May 9, 2018 report entitled, "Momentum Building Off Core Cards as Platform Programs Ramp," which reiterated that Green Dot's "legacy GPR business drives rev growth." And Morgan Stanley issued a May 10, 2018 report, which

reiterated Streit's claim that there was "[n]o impact from seemingly increased competition" and Green Dot was seeing "no impact in its customer acquisition or attrition."

85. Streit and Shifke spoke at the May 16, 2018 JPMorgan Conference. Their statements highlighted the performance of Green Dot's prepaid cards, its active account growth, and its shift to digital and direct deposit accounts while omitting critical information about Green Dot's declining core prepaid card business. For example, Streit represented that:

(a) "[E]very one of our products is hitting it and is either at or above plan, which is not common."

(b) "[O]ur ***digital platform*** has really been taking off, and the customers who get it online through the app stores are ***many times more profitable*** than retail customers as they tend to be – use the account in a more sustainable, higher-quality way. They're more likely to be on direct deposit."

(c) "I think if you had to rank them in terms of the revenue per customer, our digital customers tend to be ***higher-revenue customers***."

86. Defendant Shifke further represented that "we've concentrated on focusing on our direct deposit customer base. We've grown that very nicely. Now about 80% of our GDV comes from direct deposit. Nearly 50% of our active customers are on ***direct deposit***. And with that, GDV is growing phenomenally, and ***that's driving the engine to get the fees***, ATMs, purchase volume, interest income."

87. Streit and Shifke's May 16, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that:

(a) Digital and direct deposit accounts were not generating the high-

margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth which Defendants knew would inevitably adversely impact the Company's bottom line.

(b) The growth rate of Green Dot's legacy prepaid card business was shrinking.

**D. Defendants' August 8, 2018 Statements**

88. On August 8, 2018, Green Dot held an earnings call to discuss its Q2 2018 performance. During the call, Streit and Shifke highlighted the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues and was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, during the earnings call, defendant Streit assured investors that:

(a) "The BaaS side of the business grew a lot of accounts, obviously, with programs like the TurboTax program and the Uber driver program, those are active cards. But ***our established product lines***, Bob, ***are just really doing well. So we're seeing growth from both. So everything's growing in relative lockstep***."

(b) "I mean, ***we experienced growth with our*** – I hate to use the word legacy because the products aren't legacy, they've been redone many, many times. But ***that original part of the business, if you will, selling cards and retail and whatnot. That's really going well for us***."

(c) "Consolidated GAAP total operating revenue came in at $258.3 million, representing a year-over-year growth rate of just over 16%. We would note that ***this quarter's performance was entirely organic, with material growth***

***being driven for both our established product lines*** and our new BaaS platform programs."

(d) "The ***continuing long-term portfolio mix shift towards higher lifetime value accounts*** helped push the gross dollar volume, or GDV, flowing through our various products to more than $9.4 billion, representing organic year-over-year GDV growth of 25%."

(e) "***Step 1, as you'll recall, is to continue to grow the number of active accounts year-over-year and to improve unit economics of those accounts***. As you know from our Q2 results and our first half results more broadly, ***we're hitting the step 1 objective out of the park***."

(f) "Every metric in the Account Services segment reflects the powerful dynamic of an increasing number of active account holders who are generating far more usage and engagement with our products. ***The result continues to be an ongoing tailwind to the profitability and value of our account active portfolio***."

89. Defendant Streit's August 8, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that: (a) the growth rate for Green Dot's legacy prepaid card business was shrinking; (b) the increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line; (c) the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line; and (d) that direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line.

90. During the August 8, 2018 earnings call, defendant Shifke similarly emphasized the positive impact of the Company's "healthy growth metrics," stating:

(a) "***We increased total active accounts in the quarter by 14% year-over-year to approximately 5.9 million active accounts. This active account growth was spectacular and well ahead of our internal expectations***. Even more encouraging is that the growth in active accounts is being driven both by our newer BaaS Platform programs and our own products."

(b) ***"[T]he larger portfolio of actives also continues to demonstrate healthy growth metrics and a more profitable average account***."

(c) "As you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have ***more revenue per active on the direct deposit customers*** than you will on your one-and-dones."

91. Defendant Shifke's August 8, 2018 statements were each misleading when made. Defendants knew and/or recklessly disregarded the fact that the increase in overall active accounts masked an underlying (and undisclosed) product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

92. Defendants' August 8, 2018 representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports. For example, BTIG issued an August 9, 2018 report, noting "solid organic growth in [Green Dot's] core prepaid debit card business." And William Blair issued an August 8, 2018 report, which cited Green Dot's "improving customer mix."

**E. Defendants' November 7, 2018 Statements**

93. On November 7, 2018, Defendants convened an earnings call in

connection with Green Dot's release of its Q3 2018 results. During that call, Streit again emphasized the performance of Green Dot's prepaid debit cards, its active-account growth, and its shift to digital and direct deposit accounts in a misleading manner by omitting critical information about Green Dot's declining core prepaid debit card business, which comprised the largest and highest-margin portion of its revenues, was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line. For example, Streit stated:

(a) Green Dot achieved its "seventh consecutive quarter of active card growth . . . ." In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's legacy products and established product lines was declining, including prepaid active accounts which had declined by hundreds of thousands of accounts since December 2017.

(b) "And then unrelated to BaaS, of course, ***we have our own legacy products and established business lines, which are no slouches. I mean, those are doing very well and continue to grow***." In fact, as Defendants knew and/or recklessly disregarded, growth in Green Dot's own legacy products and established business lines was declining. For example, prepaid active accounts had declined by hundreds of thousands of accounts since December 2017.

(c) "The percentage of people who acquire our accounts now are far more likely to reload and when they reload, they're far more likely to do it through electronic means, meaning direct deposit. ***And that does mean more revenue per card***. That is real, and is a trend we see continuing." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact

the Company's bottom line.

(d) "***Step 1 is to continue to grow the number of active accounts year-over-year and to improve the unit economics on those accounts. Total active accounts have grown 12% year-to-date compared to the same period last year. So we are on track with step 1*** and feel like our future prospects for further growth in both actives and the quality of those actives are very strong." In fact, as Defendants knew and/or recklessly disregarded, the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

94. Defendant Streit's November 7, 2018 statements were each misleading when made. The true facts, which Defendants knew and/or recklessly disregarded, were that: (a) the increase in overall active accounts was part of a product-mix trend that was reversing card-revenue-and-fee-growth, which Defendants knew would inevitably adversely impact the Company's bottom line; (b) Green Dot's legacy prepaid card business was shrinking; (c) direct-deposit accounts did not generate high-margin fees associated with Green Dot's legacy prepaid accounts and thus were part of a product-mix trend that had reversed card-revenue-and-fee-growth, which the Individual Defendants knew would inevitably impact the Company's bottom line; and (d) the per-unit economics of Green Dot's card portfolio was part of a product-mix trend that reversed card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

**F. Defendants' February 2019 False Statements**

95. By the end of 2018, the number of Green Dot's legacy prepaid card users was decreasing so rapidly that the loss of revenue from such customers eliminated nearly all the Company's growth in low-margin BaaS and direct-deposit business,

amounting to a total user growth of only 1%. The disclosure of this low growth rate caused Green Dot's stock price to drop 10%. Still, Defendants perpetuated their scheme by continuing to mislead investors about the fact that this was a continuation of Green Dot's product-mix trend, which would negatively impact profitability. Instead, Defendants presented this adverse news as good news, proclaiming that "we are somewhat a victim of our own success."

96. After the market closed on February 20, 2019, Defendants convened an investor earnings call concerning Green Dot's Q4 2018 performance. On that call, Defendant Streit assured investors the slowed growth in accounts was "not relevant to our performance" and that Green Dot's prepaid card business was "growing nicely," stating:

(a) "[Cards business] has been growing nicely - very nicely, in fact." In fact, as Defendants knew and/or recklessly disregarded, the Company's card business had been declining for months, and during 2018, the Company had lost 271,000 accounts. Even as Defendants were speaking, this downward trend was accelerating, resulting in a year-over-year loss of 586,000 accounts by July 30, 2019.

(b) "So I wouldn't say we're satisfied with [active accounts] being up 1%, that's not great. It's not relevant to our performance and I'm glad that the people we're having are real customers who went to buy a real account to enroll in direct deposit . . . ." In fact, as Defendants knew and/or recklessly disregarded, direct-deposit accounts did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(c) "While the mix shift towards direct deposit and more engaged customers is clearly better for profitability and growth, the

lower churn also means fewer accounts issued to short-term customers, which weighs down on unit sales and therefore the quarterly active account metric." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not "clearly better for profitability and growth" because they did not generate the high-margin card fees of legacy prepaid accounts and thus were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

(d) "[S]trong year-over-year margin expansion of over 300 basis points was the net result of improving margins flow through across the business. And in particular, from our base of direct deposit active accounts where improving purchase volume and higher retention have a positive impact on profitability." In fact, as Defendants knew and/or recklessly disregarded, direct deposit accounts were not having a "positive impact on profitability" relative to the faltering legacy prepaid card accounts, as direct-deposit accounts were largely free, so they were part of a product-mix trend that was reversing card-revenue-and-fee-growth and would inevitably impact the Company's bottom line.

97. Defendants' statements had the desired effect of misleading the market as demonstrated by contemporaneous analyst reports. Although analysts noted the news of slowing active accounts, they continued to credit Defendants' misleading explanations, thereby blunting the market's reaction. For example, Guggenheim issued a February 21, 2019 report, which reiterated Defendants' message that "direct deposit customers are creating more robust, durable revenue streams for the company" and noted "a stronger company with a higher quality financial profile [is] emerging." J.P. Morgan issued a February 21, 2019 report, which took Defendants at their word that the decline in active cards was the result of "a more engaged user base

(fewer 'one and done' users), which is supported by continued double-digit growth in direct deposit users and purchase volume growth."

**G. Defendants' May 2019 Statements**

98. On May 8, 2019, Green Dot filed a Form 8-K with the SEC, which incorporated a press release announcing the Company's Q1 2019 financial results. The Form 8-K stated that "***our future prospects are looking materially stronger and incrementally more assured***."

99. Defendants also convened an investor earnings call on May 8, 2019, during which Streit and Shifke delivered prepared remarks and answered questions from analysts concerning Green Dot's Q1 2019 performance. During the call, Defendants chose to speak about Green Dot's declining core prepaid debit card business and perpetuated their scheme by assuring investors those customers and accounts were low value and that the decline "didn't appear to impact results in a material way." Streit made the following statements:

(a) "So while the decline in ***this low-value active component [legacy prepaid] isn't in and of itself a long-term strategic problem***, it is a short-term headwind to overall segment revenue since revenue is revenue and declining actives in any segment means less revenue." In fact, as Defendants knew and/or recklessly disregarded, the decline in the high-margin card fees of legacy prepaid accounts was part of a product-mix trend that posed a long-term strategic problem because it had reversed card-revenue-and-fee-growth and would impact the Company's year-end bottom line.

(b) "So the goal isn't to issue more low value [legacy prepaid] customers to try to get that segment to reembrace us. We don't want that. The goal is to sell enough new high-value customers to overcome it. So that means if you're selling - if you're losing 4 low-value customers,

we want to sell 1 or 1.5 new high-value customers." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers. Further, the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

(c) "***Higher purchase volume and attracting the more committed customer base should in turn lead to higher revenue and a better profit margin on those accounts.*** Step two is to continue that trend. As our Q1 active [account] KPIs indicate, we are very much on track with this step two. So, so far so good on step two." In fact, as Defendants knew and/or recklessly disregarded, for at least a year, this product-mix trend had yielded and would continue to yield lower revenue and worse profit margins, as the declining legacy prepaid customers generated the Company's highest fees and revenues.

(d) "But if you think about it roughly 3.5 to 1 difference of the value of a long-term customer, whether they're direct deposit or cash reloading, but ***the relative value of a long-term customer versus a short-term customer on average is 3.5 to 1 and we're being generous***. If you're a one-and-done guy, 8 or 9 to 1. So the average is call it 3.5 to 1." In fact, as Defendants knew and/or recklessly disregarded, the legacy prepaid customers generated the Company's highest fees and revenues, which meant, on average, it would take more than 4 non-legacy customers to make up for the loss of 4 legacy prepaid customers as the vast majority of non-legacy customers (BaaS and direct deposit) paid little to no fees.

100. The Q1 2019 Form 10-Q also stated the following with respect to the Company's compliance with anti-money laundering laws:

> We monitor the laws of all 50 states to identify state laws or regulations that apply (or may apply) to our products and services. ***We have obtained money transmitter licenses (or similar such licenses) where applicable***, based on advice of counsel or when we have been requested to do so. ***If we were found to be in violation of any laws and regulations governing banking, money transmitters, electronic fund transfers, or money laundering in the United States or abroad, we could be subject to penalties or could be forced to change our business practices***.

101. The Q1 2019 Form 10-Q also contained SOX certifications from both Streit and Shifke representing that the Company's internal controls were effective and that they had disclosed to the Company's auditors: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**H. Defendants' August 2019 Statements**

102. On August 7, 2019, Defendants convened an earnings call with investors to discuss Green Dot's Q2 2019 performance. They reduced FY 2019 guidance but continued to mislead investors with assurances about the short-term nature of the strategic problem posed by the product-mix change away from legacy prepaid cards:

> (a) Streit reassured investors "that ***the challenges we are currently experiencing are short to intermediate term in nature" and were "likely to impact only this year's revenue growth trajectory***."

(b) In response to an analyst question concerning Green Dot's launching of products that "are going head-on to address" the decline in the core business, Streit stated: "I think to expand upon that this is why we believe it's contained and sort of help you size it. And this will lead into the growth. ***We expect to be back to growth in Q4***."

(c) ***Shifke underscored Streit's positive comments stating: "And so we feel pretty good about a return to growth in Q4 based on what we're seeing today*** and also assuming maybe something goes bump in the night."

103. Streit and Shifke's foregoing August 7, 2019 statements were misleading as Defendants knew and/or recklessly disregarded that the decline in the high-margin fees of legacy prepaid card accounts was part of a product-mix trend that posed a long-term strategic problem for Green Dot because it had reversed card-revenue-and-fee-growth to such an extent that the Company could not realistically return to positive growth in the fourth quarter.

104. <u>The Individual Defendants' Knowledge of the Undisclosed Facts</u>: As revealed in Green Dot's November 7, 2019 Form 8-K regarding Q3 2019 earnings, Defendants had access to key metrics, including gross dollar volume and active accounts at quarter end, disaggregated by account type. The data was available since at least Q1 2018 and indicates that Defendants knew the year-over-year erosion of the core prepaid business. As just one example, during the May 9, 2018 earnings call, Streit responded as follows to a question concerning the quantity of active card growth that was attributable to the UniRush acquisition: "You're going to make me disaggregate[] [it] anyhow, aren't you? Okay, hold on, let me think about this. We know what the internal numbers are."

105. The Defendants were Green Dot's top executives and directors, and led or were briefed on its day-to-day operations. Streit and Shifke monitored and/or

oversaw the overall business strategy, which hinged upon knowledge of the growth (or lack thereof) of active accounts, direct-deposit accounts and legacy prepaid accounts. Each of the Individual Defendants attended meetings where declining active accounts were discussed. Streit and Shifke regularly briefed the Board of Directors on these figures and the Company's monthly and quarterly financial performance. The Individual Defendants had ultimate responsibility for directing and managing the Company's business, operations, and communications to investors, and had to keep themselves informed of the Company's day-to-day business and operations.

106. Additionally, the Individual Defendants made public statements on earnings calls and investor conferences about the growth or decline in active accounts, direct-deposit accounts, and legacy prepaid accounts, as well as the unit economics of each type of account. For example, on the Company's November 7, 2018 earnings call, Streit celebrated the "seventh consecutive quarter of active card growth," while dismissing "the active card number [a]s somewhat passé" and "not as relevant." And on the August 7, 2019 earnings call, Streit referred to the same metrics, explaining lowered guidance because Green Dot was "down by around 500,000 active prepaid accounts, primarily from the loss of nonreloading customers and cash reloading customers."

107. Shifke made similar statements demonstrating his personal knowledge regarding active accounts and unit economics per each account. For example, in Q2 2018 Shifke said, "[a]s you see the portfolio mix move more towards direct deposit customers as a percentage of total and away from one-and-dones, by definition, you'll have more revenue per active on the direct deposit customers than you will on your one-and-dones."

108. <u>The Individual Defendants Received Briefings</u>: As senior executive officers and/or directors of Green Dot, the Individual Defendants were privy to

confidential and proprietary information concerning the active accounts, failing legacy prepaid business, market competition and the unit economics underlying the Company's business strategies. Each had access to internal documents, internal communications, management meetings, Board of Directors meetings, and committee meetings, as well as information provided to them or made available to them.

109. The Individual Defendants Pocketed Millions from Insider Trades: Defendants' scheme inflated Green Dot's stock price, and the Individual Defendants capitalized on this artificial inflation, pocketing millions of dollars via the sale of their own Green Dot shares at artificially inflated prices. Streit reaped $56 million (nearly 40% of his total reported lifetime proceeds from stock sales) from sales during the Class Period, selling 731,191 shares at an average price of $76.87 per share. For his part, Shifke collected $6 million (nearly 45% of his total reported lifetime proceeds from stock sales) during the Class Period, selling 77,500 shares at an average price of $77.90 per share. When the dust had settled following Green Dot's final revelation, Green Dot stock was trading at less than $25 per share.

**I. Defendants' False Statements in the 2020 Annual Report**

110. On February 26, 2021, the Individual Defendants caused Green Dot to file its Annual Report for 2020 (the "2020 Annual Report"). The report was filed on Form 10-K and was signed by Defendants Henry, Jacobs, Brewster, Date, Hodges, Fanlo, Osher, Richey, and Shaheen. The Annual Report represented to shareholders that Green Dot maintained effective internal controls over consumer and anti-money laundering laws. The Annual Report stated in pertinent part:

> ***Anti-Money Laundering Rules***
>
> ***The Bank Secrecy Act ("BSA"), the USA PATRIOT Act of 2001 and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-***

> ***money laundering ("AML") program*** and file suspicious activity and currency transaction reports when appropriate. Among other things, ***these laws and regulations require Green Dot Corporation and Green Dot Bank to take steps to prevent the use of Green Dot Bank to facilitate the flow of illegal or illicit money, to report large currency transactions and to file suspicious activity reports***. ***We also are required to develop and implement a comprehensive AML compliance program*** and must also have in place appropriate "know your customer" policies and procedures. ***We have adopted policies and procedures to comply with these requirements.***
>
> ***The bank regulatory agencies have increased the regulatory scrutiny of the BSA and anti-money laundering programs maintained by financial institutions. Significant penalties and fines, as well as other supervisory orders may be imposed on a financial institution for non-compliance with BSA/AML requirements***.

111. The 2020 Annual Report also stated:

> We are subject to state money transmission licensing requirements and a wide range of federal and other state laws and regulations. In particular, ***our products and services are subject to an increasingly strict set of legal and regulatory requirements intended to protect consumers and to help detect and prevent money laundering, terrorist financing and other illicit activities***. For example, we are subject to the anti-money laundering reporting and recordkeeping requirements of the Bank Secrecy Act ("BSA"), as amended by the PATRIOT Act. ***In addition, legal requirements relating to the collection, storage, handling, use, disclosure, transfer, and security***

***of personal data continue to increase, along with enforcement actions and investigations by regulatory authorities related to data security incidents and privacy violations***.

112. The 2020 Annual Report also stated:

***Bank and BHC Acquisitions and Mergers***

The BHC Act, the Bank Merger Act, Utah's Financial Institutions Act and other federal and state statutes regulate acquisitions of banks and other FDIC-insured depository institutions. Green Dot Corporation must obtain the prior approval of the Federal Reserve before (i) acquiring direct or indirect ownership or control of any voting shares of any bank or BHC, if after such acquisition, it will directly or indirectly own or control 5% or more of any class of voting shares of the institution, (ii) acquiring all or substantially all of the assets of any bank (other than directly through Green Dot Bank) or (iii) merging or consolidating with any other BHC. *Under the Bank Merger Act, the prior approval of the Federal Reserve is required for Green Dot Bank to merge with another bank or purchase all or substantially all of the assets or assume any of the deposits of another FDIC-insured depository institution.* ***In reviewing applications seeking approval of merger and acquisition transactions, bank regulators consider, among other things,*** the competitive effect and public benefits of the transactions, the capital position and managerial resources of the combined organization, the risks to the stability of the U.S. banking or financial system, the applicant's performance record under the CRA, ***the applicant's compliance with fair housing and other consumer protection laws and the effectiveness of all organizations involved in combating money laundering activities. In addition, failure to implement or maintain adequate compliance***

> ***programs could cause bank regulators not to approve an acquisition where regulatory approval is required or to prohibit an acquisition even if approval is not required.***

113. The 2020 Annual Report also contained a SOX certification from Defendant Henry regarding the Company's internal controls that misrepresented that:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

114. On May 14, 2021, Green Dot and Republic Bank & Trust Company ("Republic Bank"), a subsidiary of Republic Bancorp, Inc. (NASDAQ: RBCAA), announced they had entered into a definitive agreement pursuant to which Green Dot would purchase the assets and operations of Republic Bank's Tax Refund Solutions ("TRS") business segment.

115. As part of the agreement, Green Dot agreed to pay Republic Bank approximately $165 million in cash for TRS. In a press release announcing the acquisition, Green Dot stated that "The acquisition of TRS presents unique opportunities for near- and long-term growth of our tax processing business, as we work to deliver more accessible and beneficial tax products and services to customers nationwide," said Brian Schmidt, CEO of Santa Barbara Tax Products Group, a division of Green Dot Corporation. "We look forward to welcoming TRS employees to the Green Dot family, and to benefiting from their experience and insights in the years to come."

116. These statements were false and misleading because Defendants failed to disclose the fact that the Company's consumer protection and anti-money laundering controls were materially deficient, thus subjecting the Company to increased risk of financial penalties and fines and the risk of federal regulators rejecting Green Dot's corporate M&A transactions, including its acquisition of Republic Bank's TRS subsidiary.

**J. Defendants' False Statements in the 2022 Proxy Statement**

117. On April 8, 2022, the Defendants caused Green Dot to approve the Company's annual Proxy Statement on Schedule 14(a). The proxy was signed by Defendants Dan Henry and William I. Jacobs, and was reviewed and approved by Defendants Brewster, Hodges, Date, Fanlo, Gresham, Richey, and Shaheen.

118. The 2022 Proxy stated that the Audit Committee members were responsible for ensuring the adequacy of the Company's internal controls. The members of such Committee in 2023 were Brewster (Chair), Date, Fanlo, and Shaheen. The Proxy stated that the Audit Committee "monitors the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters" and "reviews the integrity, adequacy and effectiveness of our accounting and financial reporting processes and

the adequacy and effectiveness of our systems of internal control."

119. The 2022 Proxy sought the re-election of directors Brewster, Hodges, Date, Fanlo, Gresham, Richey and Shaheen based in part on their alleged success in ensuring that Green Dot maintained effective internal controls to identify and remediate any material enterprise risks. The Proxy stated:

> **Our Board of Directors' Role in Risk Oversight**
>
> ***Our Board, as a whole, has responsibility for risk oversight, although the Risk Committee and, to a lesser extent, other committees of our Board, oversee and review risk areas for our company and its subsidiary bank. In connection with strengthening our enterprise risk management process, our Board established the Risk Committee to provide greater oversight of this function.*** The risk oversight responsibility of our Board and its committees is supported by our management reporting processes, which are designed to provide our Board with information regarding the identification, assessment and management of critical risks and management's risk mitigation strategies. The Board and its committees' areas of focus when conducting risk assessments include, but are not limited to, strategic, economic, operational (including cybersecurity), financial (accounting, credit, liquidity and tax), legal, regulatory, compliance and reputational risks.
>
> Our Audit Committee meets in executive session with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus. The Audit Committee discusses with management and our independent registered public accounting firm our guidelines and policies to govern the process by which management assesses and manages our company's exposure to

risk. The Audit Committee also discusses our major financial risk exposures and the steps management has taken to limit, monitor and control such exposures. Additionally, the Audit Committee oversees our internal audit function. ***The Risk Committee also reviews strategic, financial, information security, compliance and other execution risks and exposures, as well as regulatory exposures and other current matters that may present material risk to our company. Additionally, the Risk Committee oversees our Corporate Risk function***. The Risk Committee receives periodic reports from our Chief Risk Officer and Chief Compliance Officer on our enterprise risk management program. The Compensation Committee reviews risks and exposures associated with leadership assessment and executive compensation programs and arrangements, including incentive plans. ***The Nominating and Corporate Governance Committee reviews risks and exposures relating to significant legal compliance risks and monitors the steps management has to mitigate these exposures***.

120. The members of Green Dot's Risk Committee in 2022 were Defendant Date, who was the chair of the Risk Committee, and Defendants Brewster, Jacobs, and Richey. The members of Green Dot's Audit Committee in 2022 were Defendant Brewster, who was the chair of the Audit Committee, and Defendants Date, Fanlo, and Shaheen. The members of Green Dot's Nominating and Corporate Governance Committee in 2022 were Defendant Hodges, who was the chair of the Committee, and Directors Osher and Shaheen.

121. The 2022 Proxy also stated in relevant part:

<u>**Information Security Program**</u>

The Green Dot Information Security Program applies to all our business operations and activities as well as those of our subsidiaries and seeks to:

•***Ensure the security, confidentiality, and integrity of Green Dot's information assets, including customer information, and to ensure the proper disposal of customer and consumer information***;

•**Protect all electronic information systems maintained by Green Dot and/or connected to Green Dot's network against any anticipated threats or hazards to the security or integrity of the systems;**

•***Promote and achieve a strong culture of safeguarding customer information throughout Green Dot by implementing a training program for employees and senior management so they have a working knowledge of the Green Dot policies associated with their responsibilities; and***

•***Ensure adequate senior management and Board oversight of Green Dot's Information Security Program.***

**<u>Governance, Roles and Responsibilities</u>**

Our Chief Information Security Officer ("CISO") is responsible for maintaining and implementing the Information Security Program. ***The CISO and his staff are also tasked with establishing and maintaining adequate IT standards, system architecture standards, and internal controls. The Risk Committee oversees our Information Security Program and reviews and approves the program no less than annually***. The Risk Committee works with our CISO to help validate that

our technology direction is consistent with business objectives and that IT resources are used in an effective, efficient and risk appropriate manner. As discussed above, ***our Risk Committee is comprised entirely of independent directors, and Mr. Brewster and Ms. Richey have significant work experience related to information security issues and oversight***.

***The CISO reports to the Risk Committee quarterly on the overall status of the Information Security Program and Green Dot's compliance with the program***. ***At least annually, the CISO reviews the Information Security Program and any related policies and procedures and recommends any necessary changes***. This review includes consideration of applicable law, feedback on the effectiveness of the program, and any supervisory or Internal Audit input. ***Any substantive changes to the program are recommended by the CISO to the Risk Committee***.

***The Risk Committee regularly briefs the full Board on these matters, and the Board receives regular updates on the status of the Information Security Program***, including but not limited relevant cyber threats, roadmap and key initiative updates, and the management of information security risk.

<u>Risk Identification and Assessment</u>

***Our information security department routinely identifies foreseeable internal and external threats that could result in unauthorized disclosure, misuse, alteration, or destruction of customer information or customer information systems***. ***The CISO establishes specific procedures to assess the***

> ***likelihood and potential damage of these threats, taking into consideration the sensitivity of customer, employee and business information and the adequacy of policies, procedures, information systems and other arrangements to control risk***. Risk identification and assessment procedures address risks inherent in Green Dot's operations, including the operations of Green Dot's service providers, as well as risks arising from proposed changes to Green Dot's operations.
>
> ***Our information security department performs a risk assessment no less than annually, evaluating all information systems and identifying and assessing the risks to Green Dot's assets and the impact these risks pose to Green Dot***. Our information security department identifies information and the information systems to be protected including electronic and physical systems used to access, store, and transmit information. The risk assessment may be updated upon the acquisition of a new information system or the identification of a previously unidentified security risk. ***Based on the risk assessment(s) results, the program is evaluated to ensure it addresses the identified risks commensurate with information sensitivity as well as the complexity and scope of Green Dot's activities. Risk assessments are presented to the Risk Committee for review***.

122. These statements in the 2022 Proxy Statement were false and misleading. At the time they were made, Defendants were aware, or recklessly disregarded, the fact that various aspects of the Company's compliance risk management were

materially deficient and had been deficient since 2017, including the Company's internal controls regarding consumer compliance, compliance with AML regulations, and risk identification and assessment.

123. At the time the 2022 Proxy was filed, Defendants Brewster and Richey were the members of Green Dot's Risk Committee; one of their significant obligations as members of that Committee was to ensure Green Dot's compliance with anti-money laundering laws. The Proxy represented to Green Dot's shareholders that "Mr. Brewster and Ms. Richey have significant work experience related to information security issues and oversight." As a result of the regular reports that Brewster and Richey received from Green Dot's CISO, they knew or recklessly disregarded the material deficiencies that existed and had existed since 2017 in the Company's internal controls regarding consumer compliance, compliance with AML regulations, and risk identification and assessment. In breach of their fiduciary duties, they failed to take action to correct these material deficiencies. In addition, as noted *supra*, the Audit Committee also had substantial responsibility for ensuring the adequacy of the Company's internal controls, and the members of Green Dot's Audit Committee in 2022 were Defendant Brewster, who was the chair of the Audit Committee, and Defendants Date, Fanlo, and Shaheen.

**K. Defendants' False Statements in the 2022 Annual Report**

124. On March 1, 2023, the Individual Defendants caused Green Dot to file its Annual Report for 2022 (the "2022 Annual Report"). The report was filed on Form 10-K and was signed by Defendants Gresham, Jacobs, Brewster, Date, Fanlo, Osher, Richey, and Shaheen. The Annual Report represented to shareholders that Green Dot maintained effective internal controls over consumer and anti-money laundering laws. The Annual Report stated in pertinent part:

***Anti-Money Laundering Rules***

***The Bank Secrecy Act ("BSA"), the USA PATRIOT Act of 2001***

***and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering ("AML") program*** and file suspicious activity and currency transaction reports when appropriate. Among other things, ***these laws and regulations require Green Dot Corporation and Green Dot Bank to take steps to prevent the use of Green Dot Bank to facilitate the flow of illegal or illicit money, to report large currency transactions and to file suspicious activity reports***. ***We also are required to develop and implement a comprehensive AML compliance program*** and must also have in place appropriate "know your customer" policies and procedures. ***We have adopted policies and procedures to comply with these requirements.***

***The bank regulatory agencies have increased the regulatory scrutiny of the BSA and anti-money laundering programs maintained by financial institutions. Significant penalties and fines, as well as other supervisory orders may be imposed on a financial institution for non-compliance with BSA/AML requirements***.

125. The 2022 Annual Report also stated:

We are subject to state money transmission licensing requirements and a wide range of federal and other state laws and regulations. In particular, ***our products and services are subject to an increasingly strict set of legal and regulatory requirements intended to protect consumers and to help detect and prevent money laundering, terrorist financing and other illicit activities***. For example, we are subject to the anti-money laundering reporting and recordkeeping requirements of the Bank Secrecy Act ("BSA"), as amended by the PATRIOT Act. ***Failure to fully comply with these requirements***

***exposes us to the risk of being required to undertake substantial remediation efforts and to the risk of enforcement actions, either of which could have a material adverse impact on our results of operations, financial condition or business prospects***.

126. The 2022 Annual Report also stated:

We monitor the laws of all 50 states to identify state laws or regulations that apply (or may apply) to our products and services. We have obtained money transmitter licenses (or similar such licenses) where applicable, based on advice of counsel or when we have been requested to do so. ***If we were found to be in violation of any laws and regulations governing banking, money transmitters, electronic fund transfers, or money laundering in the United States or abroad, we could be subject to penalties or could be forced to change our business practices***.

127. The 2022 Annual Report also stated:

To support our efforts in building a modern banking platform, we expect our hosting costs and software licenses, a component of other general and administrative expenses, and salary and wage expenses, a component of compensation and benefits expenses to increase year-over-year in 2023. We also expect to continue to incur duplicative processing and other costs associated with the implementation of our modern banking platform as we expect to continue to operate redundant platforms until our technology transformation is completed. Once the implementation is completed, we expect a portion of our processing expenses to reduce and have a favorable impact to our margins. In addition, while ***we expect to continue to invest in and incur additional expenses in connection with our anti-money laundering ("AML") program,***

***including improvements to our compliance controls, policies and procedures throughout 2023, we believe these investments will ultimately help mitigate and reduce our fraud losses over the long term.***

128. The 2022 Annual Report also stated:

***Bank and BHC Acquisitions and Mergers***

The BHC Act, the Bank Merger Act, Utah's Financial Institutions Act and other federal and state statutes regulate acquisitions of banks and other FDIC-insured depository institutions. Green Dot Corporation must obtain the prior approval of the Federal Reserve before (i) acquiring direct or indirect ownership or control of any voting shares of any bank or BHC, if after such acquisition, it will directly or indirectly own or control 5% or more of any class of voting shares of the institution, (ii) acquiring all or substantially all of the assets of any bank (other than directly through Green Dot Bank) or (iii) merging or consolidating with any other BHC. *Under the Bank Merger Act, the prior approval of the Federal Reserve is required for Green Dot Bank to merge with another bank or purchase all or substantially all of the assets or assume any of the deposits of another FDIC-insured depository institution.* ***In reviewing applications seeking approval of merger and acquisition transactions, bank regulators consider, among other things,*** the competitive effect and public benefits of the transactions, the capital position and managerial resources of the combined organization, the risks to the stability of the U.S. banking or financial system, the applicant's performance record under the CRA, ***the applicant's compliance with fair housing and other consumer protection laws and the effectiveness of all organizations involved in combating money laundering activities.***

> ***In addition, failure to implement or maintain adequate compliance programs could cause bank regulators not to approve an acquisition where regulatory approval is required or to prohibit an acquisition even if approval is not required.***

129. The 2022 Annual Report also contained a SOX certification from Defendant Gresham regarding the Company's internal controls that misrepresented that:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

130. These statements were false and misleading because Defendants failed to disclose the fact that the Company's consumer protection and anti-money laundering controls were materially deficient, thus subjecting the Company to

increased risk of financial penalties and fines and a consent order from the Federal Reserve Board.

**L. Defendants' False Statements in the 2023 Proxy Statement**

131. On April 14, 2023, the Defendants caused Green Dot to approve the Company's annual Proxy Statement on Schedule 14(a). The proxy was signed by Defendants George Gresham and William I. Jacobs, and was reviewed and approved by Defendants Brewster, Date, Fanlo, Gresham, Jacobs, Osher, Richey, and Shaheen.

132. The 2023 Proxy recommended that shareholders vote in favor of the election of Brewster, Date, Fanlo, Gresham, Jacobs, Osher, Richey, and Shaheen based in part on their alleged success in ensuring that the Company's enterprise risks were adequately assessed and that effective internal controls had been implemented to prevent or mitigate such risks. The 2023 Proxy stated in relevant part:

> Our Board of Directors' Role in Risk Oversight
>
> Management continually monitors the material risks we face, including financial risk, strategic risk, enterprise and operational risk and legal and compliance risk. ***The Board is responsible for exercising oversight of management's identification and management of, and planning for, those risks. In fulfilling this oversight role, our Board focuses on*** understanding the nature of our enterprise risks, including our operations and strategic direction, as well as ***the adequacy of our risk management process and overall risk management system. While the full Board has overall responsibility for risk oversight, the Board has delegated oversight responsibility related to certain risks to the Risk Committee*** and to other committees of our Board, including responsibility for oversight and review of risk areas for our company and its subsidiary bank.

133. The 2023 Proxy also stated that the Audit Committee members were responsible for ensuring the adequacy of the Company's internal controls. The

members of such Committee in 2023 were Brewster (Chair), Fanlo, Osher, and Shaheen. The Proxy stated that the Audit Committee "monitors the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters" and "reviews the integrity, adequacy and effectiveness of our accounting and financial reporting processes and the adequacy and effectiveness of our systems of internal control."

134. The 2023 Proxy also stated:

**The Board**

Our Board, as a whole, has responsibility for risk oversight, and through its committees oversees and reviews risk areas for our company and its subsidiary bank. At its regularly scheduled meetings, the Board receives management updates and Committee reports regarding business operations, financial results, Committee activities, strategy, and discusses risks related to the business.

The Board and its committees' areas of focus when conducting risk assessments include, but are not limited to, strategic, economic, operational (including cybersecurity), financial (accounting, credit, liquidity and tax), legal, regulatory, compliance and reputational risks.

**Risk Committee**

The Risk Committee oversees enterprise risks for Green Dot and its subsidiary bank. The Risk Committee also reviews strategic, financial, information security (including cyber defense management), compliance and other execution risks and exposures, as well as regulatory exposures and other current matters that may present material risk to our company. Additionally, the Risk Committee oversees our Corporate Risk function. The Risk Committee receives periodic reports from our Chief Risk Officer and Chief Compliance Officer on our enterprise risk management program.

**Audit Committee**

Our Audit Committee meets in executive session with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus. The Audit Committee discusses with management and our independent registered public accounting firm our guidelines and policies to govern the process by which management assesses and manages our company's exposure to risk. The Audit Committee also discusses our major financial risk exposures and the steps management has taken to limit, monitor and control such exposures. Additionally, the Audit Committee oversees our internal audit function.

| Nominating and Corporate Governance Committee | Compensation Committee |
|---|---|
| The Nominating and Corporate Governance Committee reviews risks and exposures relating to corporate governance, ESG and related legal compliance risks and monitors the steps management has taken to mitigate these exposures. | The Compensation Committee reviews risks and exposures associated with leadership assessment and executive compensation programs and arrangements, including incentive plans. |

| The Role of Management |
|---|
| The risk oversight responsibility of our Board and its committees is supported by our management reporting processes, which are designed to provide our Board with information regarding the identification, assessment and management of critical risks and management's risk mitigation strategies. |

135. The 2023 Proxy also stated the following with respect to the Board's alleged oversight of enterprise and the effectiveness of the Company's internal controls:

**Information Security and Privacy Risk Oversight**

The Green Dot Information Security Program applies to all our business operations and activities as well as those of our subsidiaries and seeks to:

•***Ensure the security, confidentiality, and integrity of Green Dot's information assets, including customer information, and to ensure the proper disposal of customer and consumer information***;

•Protect all electronic information systems maintained by Green Dot and/or connected to Green Dot's network against any anticipated threats or hazards to the security or integrity of the systems;

•***Promote and achieve a strong culture of safeguarding customer information throughout Green Dot*** by implementing a training program for employees and senior management so they have a working knowledge of the Green Dot policies associated with their responsibilities; and

•***Ensure adequate senior management and Board oversight of Green Dot's Information Security Program***.

<u>**Governance, Roles and Responsibilities**</u>

Our Chief Information Security Officer ("CISO") is responsible for maintaining and implementing the Information Security Program. ***The CISO and his staff are also tasked with establishing and maintaining adequate IT standards, system architecture standards, and internal controls***. The Risk Committee oversees our Information Security Program and reviews and approves the program no less than annually. ***The Risk Committee works with our CISO to help validate that our technology direction is consistent with business objectives and that IT resources are used in an effective, efficient and risk appropriate manner***. As discussed above, our Risk Committee is comprised entirely of independent directors, and Mr. Brewster and Ms. Richey have significant work experience related to information security issues and oversight.

***The CISO reports to the Risk Committee quarterly on the overall status of the Information Security Program and Green Dot's compliance with the program. At least annually, the CISO reviews the Information Security Program and any related policies and procedures and recommends any necessary changes***. This review includes consideration of applicable law, feedback on the effectiveness of the program, and any supervisory or Internal Audit input. ***Any substantive changes to the program are recommended by the CISO to the Risk Committee***.

***The Risk Committee regularly briefs the full Board on these matters, and the Board receives regular updates on the status of the Information Security Program***, including but not limited relevant cyber threats, roadmap and key initiative updates, and the management

of information security risk.

**Risk Identification and Assessment**

Our information security department routinely identifies foreseeable internal and external threats that could result in unauthorized disclosure, misuse, alteration, or destruction of customer information or customer information systems. The CISO establishes specific procedures to assess the likelihood and potential damage of these threats, taking into consideration the sensitivity of customer, employee and business information and the adequacy of policies, procedures, information systems and other arrangements to control risk. Risk identification and assessment procedures address risks inherent in Green Dot's operations, including the operations of Green Dot's service providers, as well as risks arising from proposed changes to Green Dot's operations.

***Our information security department performs a risk assessment no less than annually, evaluating all information systems and identifying and assessing the risks to Green Dot's assets and the impact these risks pose to Green Dot***. Our information security department identifies information and the information systems to be protected including electronic and physical systems used to access, store, and transmit information. The risk assessment may be updated upon the acquisition of a new information system or the identification of a previously unidentified security risk. ***Based on the risk assessment(s) results, the program is evaluated to ensure it addresses the identified risks commensurate with information sensitivity as well as the complexity and scope of Green Dot's activities. Risk assessments are presented to the Risk Committee for review***.

///

136. The following individuals were members of the respective board committees at Green Dot in 2023:






137. These statements in the 2023 Proxy Statement were false and misleading. At the time they were made, Defendants were aware, or recklessly disregarded, the fact that various aspects of the Company's compliance risk management were materially deficient and had been deficient since 2017, including the Company's internal controls regarding consumer compliance, compliance with AML regulations, and risk identification and assessment.

138. At the time the 2023 Proxy was filed, Defendants Brewster, Date, and Richey were the members of Green Dot's Risk Committee. The Proxy represented to Green Dot's shareholders that "Mr. Brewster and Ms. Richey have significant work experience related to information security issues and oversight." As a result of the regular reports that Brewster and Richey received from Green Dot's CISO, they knew or recklessly disregarded the material deficiencies that existed and had existed since 2017 in the Company's internal controls regarding consumer compliance, compliance

with AML regulations, and risk identification and assessment. In breach of their fiduciary duties, they failed to take action to correct these material deficiencies. In addition, as noted *supra*, the Audit Committee also had substantial responsibility for ensuring the adequacy of the Company's internal controls, and the members of Green Dot's Audit Committee in 2023 were Defendant Brewster, who was the chair of the Audit Committee, and Defendants Fanlo, Osher, and Shaheen.

### M. Green Dot Is Forced to Pay $18 Million to Republic Bank After It Withdraws From Its Acquisition of Republic Bank's Tax Refund Solutions Business

139. In early October 2021, Green Dot announced that it had failed to obtain regulatory approval for its $165 million acquisition of the Tax Refund Solutions Business of Republic Bank.

140. On October 5, 2021, Republic Bank sued Green Dot in Delaware Chancery Court for breach of contract and sought specific performance. Republic Bank alleged that "on July 29, 2021, Green Dot notified Republic, for the first time and only one business day before closing, that it would be seeking the Federal Reserve Board's (the "Fed") non-objection to close, in direct contravention to the terms of the Purchase Agreement, which (i) provided that no consent or approval of a Government Authority, other than that addressed in Article 6 of the Agreement, was required to close and (ii) that no proceedings against or affecting Green Dot or any of its affiliates would adversely affect Green Dot's ability to close . . . ***Green Dot's motivation apparently related to a pre-signing issue existing between Green Dot and the Fed, which Green Dot hid from Republic.***" (emphasis added).

141. The approval of the Federal Reserve was not a condition precedent to Green Dot's acquisition of the Tax Refund Solutions Business of Republic Bank under the asset purchase agreement. But when it filed its motion for summary judgment in the Delaware case on November 15, 2021, after the Delaware judge expedited the proceedings, Republic Bank argued that Green Dot had been notified by the Federal

Reserve on October 4, 2021 that it would not grant approval or non-objection to the deal. While most of Republic Bank's briefs and evidence were sealed and thus are not available to the public, Republic Bank argued that Green Dot had stonewalled Republic Bank's discovery requests and failed to produce documents concerning its ability to close the acquisition. Thus, Green Dot apparently hid details about its interaction with the Federal Reserve that might have shed more details about why the Federal Reserve refused to grant approval.

142. The Delaware Court ultimately denied the motion for summary judgment, thus refusing to order Green Dot to go through with the acquisition, but not eliminating Green Dot's potential liability for a termination fee and damages. Republic Bank continued thereafter to press for both.

143. In January 2022, Green Dot agreed to pay the $5 million termination fee to Republic Bank.

144. Then, in June 2022, Green Dot agreed to pay $13 million to Republic Bank for damages that Republic Bank was pursuing in the Delaware litigation due to Green Dot's failure to close the acquisition. Thus, Green Dot has incurred damages of $18 million due to the wrongful conduct of its officers and directors in connection with the failed acquisition.

**N. The Company Finally Discloses the Concealed Material Deficiencies in its Internal Controls on February 27, 2024**

145. The Individual Defendants concealed the Company's faulty consumer protection and anti-money laundering practices from investors from 2017 to February 27, 2024.

146. On or about February 27, 2024, Green Dot first disclosed that it faces up to $50 million in liabilities as a result of violations it engaged in. In a Form 8-K filed on February 27, 2024, Green Dot first disclosed that it had received a proposed consent order from the Federal Reserve Board due to violations of consumer and anti-

money laundering laws, and that it had already accrued liabilities of $20 million on its financial statements for the year ended December 31, 2023.

147. The February 27, 2024 Form 8-K stated in pertinent part:

> ***Green Dot has received a proposed consent order from the Federal Reserve Board relating principally to various aspects of compliance risk management, including consumer compliance and compliance with anti-money laundering regulations***. The matters addressed in the proposed consent order relate to activities and practices that commenced prior to the company's Chief Executive Officer transition in 2020. ***Included in the consent order are proposals for civil money penalties related to these issues***.
>
> While ***Green Dot*** is still in discussions with the Federal Reserve Board regarding these proposals, it ***has accrued as part of its GAAP financial results an estimated liability of $20 million related to the proposed consent order*** during the quarter ended December 31, 2023. Green Dot believes ***the estimate of the aggregate range of reasonably possible losses (meaning the likelihood of losses is more than remote but less than likely) is up to $50 million as of December 31, 2023***. This estimated range of reasonably possible losses is based on currently available information for those proceedings in which Green Dot is involved and considers its best estimate of such losses for those matters for which an estimate can be made. However, there can be no assurance that its accrual is sufficient or that losses from the consent order will not exceed the estimated range.

148. The Form 8-K also disclosed disappointing financial results for 2023 and disappointing guidance for 2024, as well as a quote from Defendant Shaheen stating that "We are confident in our financial and regulatory positions and do not expect this

to impact our ability to operate and serve our customers and partners on an ongoing basis," Gresham continued. "The regulatory environment is continuously evolving, and we are committed to partnering and fully cooperating with our regulators to ensure our products are designed and marketed in ways that put our customers' best interests at the forefront."

149. However, the Form 8-K conceded that Green Dot could not guarantee that it would not incur fines, costs and expenses related to the consent order in excess of $50 million, and that it had excluded from its financial results any amounts in excess of the $20 million accrual it had already booked: "Additionally, any fines or direct losses in excess of Green Dot's accrual for the proposed consent order are expressly excluded from its outlook."

150. Then, two days later in its Form 10-K Annual Report dated February 29, 2024, Green Dot disclosed that "we and our subsidiary bank received a proposed consent order from the Federal Reserve Board relating principally to various aspects of compliance risk management, including consumer compliance and compliance with AML regulations. The proposed consent order includes proposals for civil money penalties related to these issues and while the amount of any monetary penalty and the nature of any other relief the Federal Reserve Board may seek to obtain from us have not yet been determined, we have accrued an estimated liability of $20 million related to the proposed consent order during the three months ended December 31, 2023 and estimate that the aggregate range of reasonably possible losses is up to $50 million as of December 31, 2023."

151. Then, on July 19, 2024, it was reported that Green Dot had agreed to pay $44 million to the Federal Reserve to resolve the proposed consent decree and allegations that it engaged in unfair, or deceptive acts or practices (UDAPs).

152. The Federal Reserve Banks of San Francisco and Dallas examined Green Dot's compliance risk management framework. According to the reserve banks,

Green Dot engaged in unfair or deceptive acts and practices (UDAPs) by maintaining a deficient consumer compliance risk management program. Additionally, the Federal Reserve Banks reviewed Green Dot's practices related to the marketing, selling, and servicing of general purpose reloadable (GPR) prepaid debit card accounts and Green Dot's offering of tax return preparation payment services.

153. First, the agencies asserted that from May 2020 to June 2020, Green Dot was deceptive in assessing fees on zero-balance accounts. The reserve banks alleged that Green Dot's prepaid debit card packaging, cardholder agreements, and online disclosures declared accounts would close when consumers spent their account balances down to zero dollars. Yet many accounts remained open despite having a zero-dollar account balance, which caused consumers to incur monthly fees.

154. Second, the agencies alleged that from June 2019 to December 2020, Green Dot acted deceptively by making representations in its GPR prepaid debit card packaging, point-of-sale advertising, and online disclosures that consumers could register their prepaid debit card accounts by telephone or online. The agencies claimed, however, that consumers could only register their accounts online. According to the agencies, the bank discontinued the telephonic registration option without updating the card packaging, which prevented customers who lacked internet access from registering and using their cards.

155. Third, the agencies alleged from May 2020 to June 2020, Green Dot acted unfairly by not allowing its customers to cure account blocks. The agencies also claimed the customers could not access their funds in their GPR prepaid debit cards receiving Washington state unemployment insurance benefits.

156. Fourth, the agencies alleged from August 2020 to September 2020, a third-party payment processor caused Green Dot to engage in an unfair act. According to the agencies, the processor failed to timely release extended authorization holds in connection with GPR prepaid debit card transactions made by consumers until several

days after the settlement of the transaction. As a result, consumers were denied access to their funds, and their account balances were reduced.

157. Finally, the agencies alleged Green Dot engaged in a deceptive practice when its nonbank subsidiary did not clearly disclose the full cost of its tax refund processing fee to a major tax preparer's customers. Green Dot handled disclosing its fees on the major tax preparer's website, which offered customers the option to "pay nothing out of pocket" by deducting the tax preparation fee from their refund amount. However, the agencies alleged the website did not clearly and conspicuously disclose whether customers also needed to pay a separate tax refund processing fee.

158. Along with paying $44 million to the Fed, Green Dot agreed to submit a written, revised Bank Secrecy Act/anti-money laundering compliance program acceptable to the San Francisco Reserve Bank. Green Dot also agreed to submit a written program for monitoring and reporting suspicious activity.

159. Green Dot's settlement with the Federal Reserve was memorialized in a July 19, 2024 "Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended," which was signed by Defendant Gresham on behalf of Green Dot. *See* **Exhibit 1**. The settlement specifically makes the Green Dot board of directors responsible for compliance with the terms of the settlement and requires the board to "submit to the Reserve Banks consolidated written progress reports detailing the form and manner of all actions taken to comply with the provisions of this Order, a timetable, and schedule to implement specific remedial actions to be taken, and the results thereof." *See* Ex. 1 at ¶17. In announcing the settlement, the Federal Reserve issued a press release stating that "Green Dot did not maintain effective consumer compliance risk management and anti-money laundering programs." *See* **Exhibit 2**.

/ / /

/ / /

## IX. DAMAGES TO GREEN DOT

160. Green Dot has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

161. As a direct and proximate result of the Individual Defendants' conduct, Green Dot has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) On or about July 31, 2024, Green Dot disclosed that it had agreed to pay ***$44 million to resolve a proposed consent order with the Federal Reserve Board*** arising out of the Company's violation of consumer protection and anti-money laundering laws;

(b) Green Dot has been damaged due to ***Defendants Streit and Shifke's sale of $62 million dollars of Green Dot shares at artificially inflated prices*** based on material, undisclosed inside information; the undisclosed information belonged to Green Dot and case law is clear that the Company was harmed by the insiders' improper trading on material insider information; Green Dot has the right to recoup the unlawful profits realized by Streit and Shifke, but has failed to pursue such amounts, thus necessitating this derivative action;

(c) $18 million paid to Republic Bank, including a $5 million termination fee and $13 million to settle the litigation filed against Green Dot in Delaware Chancery Court arising out of Green Dot's refusal to close the acquisition of Republic's Tax Refund Solutions Business;

(d) Additional legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws; at a minimum the Company has already been forced to pay the deductible for its D&O insurance policy covering the individual

defendants, which amount upon information and belief is in the range of $5 million;

(e) loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(f) amounts paid to outside lawyers, accountants, and investigators in connection with Green Dot's internal investigation of the wrongdoing and the lack of adequate and effective internal controls over consumer and anti-laundering laws; and

(g) loss of revenues and profits due to the wrongdoing.

## X. DERIVATIVE ALLEGATIONS

162. Plaintiff brings this action for the benefit of Green Dot to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

163. Green Dot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164. Plaintiff has continuously owned Green Dot common stock at all relevant times. Plaintiff therefore will adequately and fairly represent the interests of Green Dot in enforcing and prosecuting its rights.

165. Green Dot's Board at the time this action was initiated consisted of the following directors: Jacobs, Richey, Gresham, Shaheen, Brewster, Fanlo, Razon, and Millard. Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

166. Where the board consists of an even number of directors, plaintiff need only show that half of the directors lack independence or face a substantial likelihood

of liability to establish that a demand on the board would be futile. As shown below, the demand in this case would be futile because at least four of the Director Defendants lack independence and/or face a substantial likelihood of liability.

## I. Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability

### A. Gresham Lacks Independence

167. Demand is futile as to Gresham because he lacks independence. As admitted by Green Dot in its 2024 Proxy Statement, Gresham is not an independent director because he is the Company's Chief Financial Officer and Chief Operating Officer, and has continuously held such roles since 2021. This decision as to Gresham's lack of independence was made by the Board itself.

168. Gresham is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct. The Company's recent February 2024 disclosure that Green Dot's internal controls over consumer and anti-money laundering laws have been defective since 2017 directly implicate Gresham, the Company's CFO and COO, who bore responsibility for such controls and filed numerous SOX certifications during the Relevant Period misrepresenting the effectiveness of such controls. Gresham signed the July 19, 2024 Consent Decree and settlement agreement with the Federal Reserve in which Green Dot was forced to pay $44 million to the government.

169. For example, Gresham is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements. In fact, Gresham prepared and/or signed the Company's SEC filings that contained false and misleading statements, including the relevant Annual Reports on Forms 10-K and the relevant Proxy Statements. Moreover, in conjunction with the filing of the Company's 2022 Forms 10-K and Forms 10-Q, Gresham signed certifications as required by SOX that, *inter alia*:

(a) affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting" for Green Dot;

(b) certified that he has disclosed to Green Dot's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Green Dot's] ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Green Dot's] internal controls over financial reporting"; and

(c) certified that, to the best of his knowledge: (i) the Forms 10-K and Forms 10Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [Green Dot]"; and (iii) the information contained in the Forms 10-K and Forms 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

170. The above representations were false and misleading (and thereby violated SOX) because, as noted above, during the Relevant Period, the Company's internal controls were not effective and were frequently disregarded, and the Company's statements regarding its internal controls and other financial statements

were materially false and misleading. In announcing the July 19, 2024 settlement, the Federal Reserve issued a press release stating that "Green Dot did not maintain effective consumer compliance risk management and anti-money laundering programs." *See* **Exhibit 2**.

171. Gresham also lacks independence and faces a substantial likelihood of liability for the claims asserted in this action because he directly engaged in many of the unlawful acts that have subjected Green Dot to liability and monetary fines and damages.

### B. Brewster Lacks Independence

172. Brewster is not independent because he served as Green Dot's interim President from January 2020 through March 2020. Brewster was brought in to review and fix the fraud committed by Shifke and Streit but failed to do so and instead helped the Company attempt to cover up the wrongdoing. Brewster thereby breached his duties of loyalty and candor to the Company. Because such breaches of fiduciary duty cannot be indemnified, Brewster faces a substantial likelihood of liability; he therefore lacks independence, making a demand as to him futile.

173. As part of his duties as interim President, Brewster discovered or was reckless in not discovering the fact that the Company lacked effective internal controls over consumer protection and anti-money laundering laws. Rather than disclosing such material facts and remedying the deficiencies, Brewster helped cover up and conceal the problems, thus breaching his duties of candor and loyalty to the Company, which cannot be indemnified. Demand as to Brewster is therefore futile.

### C. More Than Half the Board Faces a Substantial Likelihood of Liability for Causing the Company to Issue False and Misleading Statements

174. As alleged in this complaint, Defendants Jacobs, Richey, Gresham, Shaheen, Brewster, and Fanlo all directly made or signed one or more false statements contained in the Company's quarterly, annual, and/or proxy statements during the

Relevant Time Period. They therefore breached their duties of candor and good faith/loyalty to the Company. Because such violations cannot be indemnified, Defendants Jacobs, Richey, Gresham, Shaheen, Brewster, and Fanlo are interested in the claims asserted herein and thus lack independence. A demand on them to bring the present claims would thus be a futile and useless act.

175. These facts, detailed in more particularity *supra*, demonstrate that the Director Defendants have caused Green Dot to operate the Company based on an unlawful business model, thereby breaching their duties of good faith and loyalty to Green Dot and its shareholders. Demand as to each Director Defendant is thus futile. Indeed, the Director Defendants' failure to cause Green Dot to maintain effective internal controls over consumer protection and anti-money-laundering laws has already cost the Company $20 million and could end up costing it $50 million or more, as the Company disclosed on February 27, 2024.

176. Moreover, Directors Jacobs, Richey, Gresham, Shaheen, Brewster, and Fanlo can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity during the Relevant Period because the wrongdoing concerned the Company's core business — deposit account programs (such as prepaid debit cards and checking account products) and money processing services.

### D. The Entire Board Has Evidenced Its Hostility to the Claims Asserted Herein By Failing to Pursue the Claims Despite the Fact that the Court Has Upheld Securities Fraud Claims Against Some of the Defendants and Despite the Fact that Defendants' Misconduct Has Already Harmed the Company by Over $100 Million

177. Despite the fact that Defendants Streit and Shifke sold $62 million dollars of Green Dot shares at artificially inflated prices based on material, undisclosed inside information, and are named defendants in the currently-pending federal securities class action, alleging that they violated § 10(b) of the Exchange Act and Rule 10b-5 when they disseminated or approved the false and misleading statements set forth above, the Director Defendants have done absolutely nothing to pursue any

claims against Streit and Shifke for the enormous harm they have caused to the Company. The complaint in the 10b-5 class action has already survived a motion to dismiss and been upheld under the stringent pleading standards of the PSLRA.

178. Defendants Streit and Shifke sold $62 million of Green Dot shares at artificially inflated prices, based on material insider information that belonged to Green Dot, not them. As noted above, despite the fact that the Court has upheld securities fraud claims against Streit and Shifke, the entire Green Dot Board has failed to take any action whatsoever to pursue redress against Streit and Shifke to recover such amounts for the Company, which is the owner of the claims. The failure of the current Board to pursue such remedies, which are sought in this action, amply demonstrates their actual hostility to the breach of fiduciary duty and unjust enrichment claims, thus establishing demand futility.

179. The Individual Defendants' misconduct has also resulted in the Company having to pay the Federal Reserve $44 million in July 2024 due to UDAPs and defective internal controls. Those same defective internal controls and UDAPs caused the Federal Reserve to refuse to approve Green Dot's $165 million acquisition of Republic Bank's Tax Refund Solutions Business, which later forced Green Dot to pay $18 million to Republic Bank, including the $5 million termination fee and $13 million to settle the Delaware litigation filed against Green Dot in Delaware Chancery Court arising out of Green Dot's refusal to close the acquisition. Despite these huge damages to the Company, which directly implicate the Board since it was the Board which was responsible for adopting and implementing an effective system of internal controls, the Board has refused to pursue damages against itself or the Company's executives responsible for the misconduct. Demand is thus futile.

**E. Additional Reasons Demonstrating Futility of Demand**

180. The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and

allies in the top ranks of the Company for the violations of law complained of herein. A majority of the current Board members has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

181. For example, as noted *supra*, a majority of the current Board approved and signed the Company's SEC filings that contained false and misleading statements. Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused.

182. Every member of the Board either knew the true facts and recklessly disregarded them, or declined to inform themselves of misconduct complained of herein, even when they had a reasonable basis to believe that further investigation was warranted. Thus, demand is excused. Causing the Company to violate the anti-money-laundering laws amply demonstrates the Board's disloyal and bad faith conduct. Any conduct evidencing bad faith and a lack of loyalty to the Company is outside the protection of the business judgment rule and constitutes conduct that is non-indemnifiable. Thus, demand is excused as to the entire Board.

183. Defendants Brewster, Fanlo, and Shaheen are members of the Audit Committee and therefore had a clear duty to be kept informed about the Company's accounting procedures, and yet just as clearly, they disregarded such duties. Defendants Brewster, Fanlo, and Shaheen have violated the terms of the Audit Committee Charter, which, among other things, required them to review the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, and evaluate the adequacy and effectiveness of internal controls that could significantly affect the Company's financial statements, as well as the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon. As such, Defendants are incapable of disinterestedly and independently

considering a demand to commence and vigorously prosecute this action.

184. Directors Richey and Brewster are also members of the Risk Committee. The Charter of Green Dot's Risk Committee specifically states that its members are responsible for ensuring the Company's compliance with money laundering rules and regulations: "***The Committee shall review and discuss the key risk types facing the Company, including financial crimes risk (including Bank Secrecy Act/anti-money laundering risk***), information security risk (including cyber defense management), model risk, operational risk, credit risk, regulatory compliance risk, reputation risk, strategic risk, and technology risk, and the most significant cross-functional risk areas that cut across multiple risk types and/or require significant coordination across multiple risk oversight functions (including counterparty credit risk). The Committee also shall review and discuss management's assessment of the Company's aggregate enterprise-wide risk profile, as well as the alignment of the risk profile with the Company's strategic plan, goals, objectives, and risk appetite."

185. Because they repeatedly failed to comply with these duties as members of the Risk Committee, Directors Richey and Brewster breached their duties of good faith and loyalty to Green Dot, exposing them to a substantial likelihood of liability as to the claims asserted herein. Demand is therefore futile as to Richey and Brewster.

186. Although the Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches. Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting the Company by bringing this action. Thus, demand on the Board is futile.

/ / /

/ / /

## XI. CAUSES OF ACTION

### COUNT I

### For Breaches of Fiduciary Duties Against All Defendants

187. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Green Dot's business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

189. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

190. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Green Dot.

191. In breach of their fiduciary duties owed to Green Dot, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee Green Dot's business, rendering them personally liable to the Company for breaching their fiduciary duties.

192. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and the effectiveness of the Company's internal controls over consumer and money laundering laws and regulations, and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Green Dot's securities.

193. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Green Dot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### For Abuse of Control
### Against All Defendants

195. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Green Dot, for which they are legally responsible.

197. As a direct and proximate result of the Individual Defendants' abuse of control, Green Dot has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Green Dot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### For Unjust Enrichment
### Against Defendants Streit and Shifke

198. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199. By their wrongful acts and omissions, Individual Defendants Shifke and Streit were unjustly enriched at the expense of, and to the detriment of, Green Dot.

200. During the Relevant Period, Individual Defendants Shifke and Streit sold approximately $62 million of their Green Dot stock at inflated prices based on material, non-public information that belong to Green Dot.

201. As a result of their possession of such material, non-public information, Streit and Shifke were required to abstain from trading in Green Dot securities or disclose the material, non-public information. They failed to do so.

202. Plaintiff, as shareholder and representative of Green Dot, seeks restitution from Individual Defendants Shifke and Streit and seeks an order from this Court disgorging all insider trading proceeds, as well as all benefits, and other compensation, including any performance-based compensation, obtained by Defendants Streit and Shifke due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against Defendants Richey, Feld, Osher, Henry, Jacobs, Brewster, Hodges, Date, Fanlo, Gresham, and Shaheen)

203. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with

regard to this claim.

204. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

205. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2022 and 2023 Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to re-elect the members of the Board, approve executive compensation, and renew the contract of the Company's outside auditor. The Proxy Statements, however, misstated or failed to disclose the material information alleged *supra*.

206. By reasons of the conduct alleged herein, Defendants are in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to re-elect the Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

207. Plaintiff thereby seeks injunctive and equitable relief because the conduct

of the Individual Defendants interfered with Plaintiff's voting rights and choices at the annual meetings.

208. This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Green Dot and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Green Dot;

C. Determining and awarding to Green Dot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D. Directing Green Dot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Green Dot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2) a provision to permit the shareholders of Green Dot to nominate at least two candidates for election to the Board;

(3) a proposal to strengthen the Board's supervision of the Company's CEO, COO, and CFO;

(4) a provision to appropriately test and then strengthen the internal audit and control functions and improve the Company's internal controls over consumer protection and anti-money-laundering laws; and

(5) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E. Awarding Green Dot restitution from the Individual Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 27, 2024

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Counsel for Plaintiff*

# VERIFICATION

I, Dino DiBlasio, verify that I am a shareholder of nominal defendant Green Dot Corporation (the "Company"), and that I have continuously owned shares of stock in the Company at all relevant times and since at least April 2019. I have reviewed the allegations in this Verified First Amended Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/24/2024

DocuSigned by:
Dino DiBlasio
5F835DE08F0A456...
Dino DiBlasio

# EXHIBIT 1

EXHIBIT 1

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

In the Matter of:

GREEN DOT BANK
Provo, Utah

GREEN DOT CORPORATION
Austin, Texas

Docket Nos. 24-005-B-SM
24-005-B-HC
24-005-CMP-SM
24-005-CMP-HC

Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended

WHEREAS, Green Dot Corporation, Austin, Texas, (the "Holding Company") is a registered bank holding company that owns and controls Green Dot Bank, Provo, Utah, (the "Bank") a state member bank, and various nonbank subsidiaries (collectively, "Green Dot");

WHEREAS, the Board of Governors of the Federal Reserve System (the "Board of Governors") is the appropriate federal supervisor of the Bank and the Holding Company;

WHEREAS, recent examinations of Green Dot, conducted by the Federal Reserve Bank of San Francisco (the "San Francisco Reserve Bank") and the Federal Reserve Bank of Dallas (the "Dallas Reserve Bank") (collectively, "Reserve Banks") identified certain significant deficiencies relating to Green Dot's compliance risk management framework, including, but not limited to deficiencies in consumer compliance and compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering ("AML") compliance, including the Bank Secrecy Act ("BSA") (31 U.S.C. § 5311 et seq.); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X); and the requirements

of Regulation H of the Board of Governors to report suspicious activity and to maintain an adequate BSA/AML compliance program (12 C.F.R. §§ 208.62 and 208.63) (collectively, the "BSA/AML Requirements");

WHEREAS, to address the deficiencies and manage the risks described in this Order, Green Dot is making enhancements to their consumer compliance risk management program and BSA/AML compliance program, but additional substantive corrective actions are required;

WHEREAS, following the submission of consumer complaints, the Board of Governors and the San Francisco Reserve Bank conducted a review of Green Dot's practices related to the marketing, selling, and servicing of general purpose reloadable ("GPR") prepaid debit card accounts and Green Dot's offering of tax return preparation payment services with a third party that have revealed certain consumer compliance deficiencies resulting in unfair or deceptive acts or practices in or affecting commerce, within the meaning of section 5(a)(1) of the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45(a)(1)), and unsafe or unsound practices. Specifically, the review found that:

**Assessment of Fees on Zero Balance Accounts**

A. From November 2017 through January 2021, the Bank engaged in a deceptive act or practice by misrepresenting through GPR prepaid debit card packaging, cardholder agreements, and online disclosures that such accounts would be closed after consumers spent their account balances down to zero dollars when, in fact, many accounts remained open despite having a zero-dollar account balance and those consumers continued to incur monthly fees.

**Telephone Registration of Prepaid Debit Card Accounts**

B. From June 2019 through December 2020, the Bank engaged in a deceptive act or practice by misrepresenting through GPR prepaid debit card packaging, point-of-sale advertising

and online disclosures that consumers could register their GPR prepaid debit card accounts by telephone or online when, in fact, consumers could not register the cards telephonically and only could register their accounts online. This violation resulted from the Bank's discontinuation of the telephonic registration option without updating the card packaging, which prevented customers who lacked internet access from registering and using their cards.

**Blocking Access to Prepaid Card Accounts Without Reasonable Policies and Procedures**

C. From May 2020 through June 2020, the Bank engaged in unfair acts or practices through its lack of reasonable policies and procedures to permit the Bank's legitimate customers to cure account blocks and obtain access to their funds in their GPR prepaid debit card accounts receiving Washington state unemployment insurance benefits.

**Extended Authorization Holds**

D. From August 2020 through at least September 2020, due to a third-party payment processor's data migration error, the Bank engaged in an unfair act or practice by failing to timely release extended authorization holds in connection with certain GPR prepaid debit card transactions made by consumers (including at gas station point-of-sale terminals) until several days after the settlement of the transactions, thereby reducing available account balances and denying consumers access to their funds.

**Tax Return Preparation Payment Services Fees**

E. From January 2017 through December 2022, Santa Barbara Tax Products Group ("TPG"), a wholly owned nonbank subsidiary of the Holding Company that has contracted with a third party, a major tax preparer, to offer tax return preparation payment services to the major tax preparer's customers, engaged in a deceptive act or practice by failing to disclose clearly and conspicuously to the major tax preparer's customers the full cost of their tax refund processing

fee. The Holding Company is responsible for the disclosure of its fees on the major tax preparer's website. The major tax preparer's website offered customers the option to "pay nothing out of pocket" by deducting the tax preparation fee from the amount of their tax refund, but the website did not clearly and conspicuously disclose that customers also must pay a separate tax refund processing fee. Consumers had to click on hyperlinks located at the bottom of web pages or click on drop-down menus to reveal a lengthy list of small-print statements including the disclosure of the separate tax refund processing fee. Under the agreement with the major tax preparer, TPG received a small portion of the tax refund processing fee paid by consumers. By 2022, TPG implemented several enhancements on the website regarding the tax refund processing fee.

WHEREAS, the Bank and the Holding Company took actions to cease and remediate the practices as described in WHEREAS clauses paragraphs A. through E. above, but additional improvements related to unfair or deceptive acts or practices controls are required;

WHEREAS, the unfair or deceptive acts or practices in or affecting commerce in violation of section 5 of the FTC Act and unsafe or unsound practices in consumer compliance, as described in WHEREAS clauses paragraphs A. through E. above, warrant a combined Order to Cease and Desist and Order of Assessment of a Civil Money Penalty (the "Order") by the Board of Governors against Green Dot under sections 8(b)(1), (b)(2), (b)(3) and 8(i)(2) of the Federal Deposit Insurance Act, as amended ("FDI Act") (12 U.S.C. §§ 1818(b)(1), (b)(2), (b)(3) and 1818(i)(2));

WHEREAS, the Board of Governors, the Bank, and the Holding Company have mutually agreed to enter into this Order;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Banks, the Bank, and the Holding Company that the Bank and the Holding Company operate in a safe and sound manner and comply with all applicable federal and state laws, rules, and regulations, including, but not limited to, the BSA/AML Requirements and section 5(a)(1) of the FTC Act; and

WHEREAS, the boards of directors of the Bank and the Holding Company, at duly constituted meetings, adopted resolutions authorizing and directing the undersigned to enter into this Order on behalf of the Bank and the Holding Company, respectively, and consenting to compliance with each and every provision of this Order by the Bank and the Holding Company, and waiving all rights that the Bank and the Holding Company may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818), including but not limited to: (i) the issuance of a notice of charges on any and all matters set forth in this Order; (ii) a hearing for the purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order; and (iv) challenging or contesting, in any matter, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision hereof.

NOW THEREFORE, before the filing of any notices, or taking of any testimony, or adjudication of or finding on any issues of fact or law herein, and without the Bank and the Holding Company admitting or denying any allegation made or implied by the Board of Governors in connection herewith, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, it is hereby ordered, pursuant to sections 8(b)(1), (b)(2), (b)(3) and 8(i)(2) of the FDI Act (12 U.S.C. §§1818(b)(1), (b)(2), (b)(3) and 1818(i)(2)), that:

**Source of Strength**

1. The board of directors of the Holding Company shall take appropriate steps to fully utilize the Holding Company's financial and managerial resources, pursuant to section 38A of the FDI Act (12 U.S.C. § 1831*o*-1) and section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with any supervisory action taken by its federal or state regulators.

**BSA/AML Compliance Program**

2. Within 90 days of this Order, the Bank shall submit a written revised BSA/AML compliance program that is acceptable to the San Francisco Reserve Bank. The revised program shall include the following seven items:

(a) a system of internal controls designed to ensure compliance with the BSA/AML Requirements;

(b) measures to ensure adherence to approved compliance policies, procedures, and standards;

(c) a comprehensive BSA/AML risk assessment that appropriately identifies and considers all products and services of the Bank, customer types, and geographic locations, as appropriate, in determining inherent and residual risks;

(d) enhanced policies and procedures for the Customer Identification Program sufficient to ensure the Bank has a reasonable belief that it knows the true identity of its customers;

(e) management of the Bank's BSA/AML compliance program by a qualified compliance officer, who is given full autonomy, independence, and responsibility for implementing and maintaining an effective BSA/AML compliance program that is commensurate with the Bank's size and risk profile, has meaningful decision-making authority, and is supported by adequate staffing levels and resources;

(f) independent testing procedures to ensure that comprehensive and timely reviews of the Bank's BSA/AML compliance program are performed on a regular basis by qualified parties who are independent of the Bank's business lines and compliance function; and

(g) effective training for all personnel, including targeted training for personnel with compliance-related responsibilities, in all aspects of the BSA/AML Requirements and applicable internal policies and procedures.

**Suspicious Activity Monitoring and Reporting**

3. Within 90 days of this Order, the Bank shall submit a written program acceptable to the San Francisco Reserve Bank and reasonably designed to ensure the identification and timely, accurate, and complete reporting by the Bank of all known or suspected violations of law or suspicious transactions to law enforcement and supervisory authorities, as required by applicable suspicious activity reporting laws and regulations. The program shall include the following four items:

(a) a well-documented methodology for establishing monitoring rules and thresholds appropriate for the Bank's risk profile, which considers factors such as type of customer, type of product or service, geographic location, and banking activities;

(b) policies, procedures, and processes that provide for periodic review of the monitoring rules;

(c) effective monitoring of customer accounts and transactions; and

(d) policies, procedures, and processes with respect to the review and analysis of suspicious activity, including the escalation and resolution of concerns, and measures to ensure that alert dispositions are supported with adequate rationale and documentation to evidence the research performed and the due diligence that was relied upon to arrive at the Bank's conclusion.

**Transaction Review**

4. (a) Within 30 days of this Order, the Bank shall engage an independent third party acceptable to the San Francisco Reserve Bank to conduct a review of the Bank's transaction monitoring activity from August 1, 2021 through and including October 31, 2022 to determine whether suspicious activity involving high risk customers or transactions at, by, or through the Bank was properly identified and reported in accordance with applicable suspicious activity reporting regulations (the "Transaction Review"). Within 60 days of completing the Transaction Review, the Bank shall provide to the San Francisco Reserve Bank a written report detailing the independent third party's findings (the "Transaction Review Report").

(b) Based on the San Francisco Reserve Bank's evaluation of the results of the Transaction Review, the San Francisco Reserve Bank may direct the Bank to engage the independent third party to conduct a review of the types of transactions described in paragraph 4(a) for additional time periods.

5. Within 30 days of the engagement of the independent third party, but prior to the commencement of the Transaction Review, the Bank shall submit to the San Francisco Reserve Bank for approval an engagement letter that sets forth:

(a) the scope of the Transaction Review;

(b) the methodology for conducting the Transaction Review, including any sampling procedures to be followed;

(c) the expertise and resources to be dedicated to the Transaction Review;

(d) the anticipated date of completion of the Transaction Review and the Transaction Review Report; and

(e) a commitment that supporting material and any drafts thereof associated with the final Transaction Review and the Transaction Review Report will be made available to the San Francisco Reserve Bank upon request.

6. Throughout the Transaction Review, Green Dot shall ensure that all matters or transactions required to be reported that have not previously been reported are reported in accordance with applicable rules and regulations.

**No Misrepresentations or Omissions**

7. Green Dot shall continue to take all actions necessary to correct and prevent the re-occurrence of all violations of section 5(a)(1) of the FTC Act and maintain future compliance with section 5(a)(1) of the FTC Act.

8. Green Dot shall refrain from making, or allowing to be made, in connection with any product or service, whether offered by the Bank directly or through a third party, any misleading or deceptive representation, statement, or omission, expressly or by implication, including but not limited to with respect to the marketing, selling, and servicing of GPR prepaid debit cards and tax return preparation payment services.

9. Green Dot shall make no representations to any insured depository institution, any consumers, or any other person or entity that the Board of Governors, the Reserve Banks, or any

employee, agent, or representative of the Board of Governors or the Reserve Banks have endorsed or approved any aspect of any product or service offered by the Bank.

10. (a) Within 30 days of the effective date of this Order, Green Dot shall provide a copy of this Order to any existing third-party service provider or other third-party partner, including a federal, state, or municipal entity that:

(i) provides services to Green Dot that are material to the offering of products, services, or benefits to consumers by Green Dot; or

(ii) to which Green Dot provides services that are material to the offering of products, services, or benefits to consumers by such third-party service provider or third-party partner; and

(b) Green Dot shall provide a copy of this Order to a prospective third-party service provider or other third-party partner prior to entering into any contract or other arrangement described in paragraph 10(a) with such third-party service provider or other partner.

11. Green Dot shall develop policies and procedures that provide reasonable standards for applying and removing a fraud-related block to a GPR prepaid debit card account, and for permitting legitimate customers to cure such account blocks.

**Consumer Compliance Board Oversight Plan**

12. Within 90 days of this Order, the board of directors of the Holding Company shall submit to the San Francisco Reserve Bank an acceptable written plan to strengthen the board of directors' oversight of the enterprise-wide consumer compliance risk management program ("Board Oversight Plan"). The Board Oversight Plan shall describe the actions that the board of directors has taken and/or will take to improve the enterprise-wide consumer compliance risk

management program and a timeline for the actions to be taken. The Board Oversight Plan shall include the following four items:

(a) measures to communicate the board of directors' clear expectations regarding compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(b) measures to ensure adherence to approved consumer compliance policies, procedures, and standards for consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(c) measures to ensure the appropriate and timely resolution of audit findings, consumer compliance risk assessments, and examination findings for consumer protection laws and regulations, including section 5(a)(1) of the FTC Act; and

(d) measures to enhance reports on the status and results of consumer complaints, the measures taken, or to be taken, by senior management to remediate outstanding consumer compliance deficiencies identified by consumer complaints; and any initiatives necessary to comply fully with this Order.

**Consumer Compliance Risk Management Plan**

13. Within 60 days of this Order, the Holding Company shall retain an independent consultant, acceptable to the San Francisco Reserve Bank, in consultation with the Board of Governors, to assist in developing an acceptable written plan to enhance the enterprise-wide consumer compliance risk management program to ensure that the marketing, selling, and servicing of consumer products and services, including, but not limited to, GPR prepaid debit cards and tax return preparation payment services, whether offered by Green Dot directly or

through a third party, comply with all consumer protection laws and regulations, including section 5(a)(1) of the FTC Act ("Consumer Compliance Risk Management Plan").

14. Within 120 days of the engagement of the independent consultant, Green Dot and the independent consultant shall submit to the San Francisco Reserve Bank an acceptable Consumer Compliance Risk Management Plan. The Consumer Compliance Risk Management Plan shall include the following seven items:

(a) measures to ensure that Green Dot takes the actions required by paragraphs 7 through 11 of this Order;

(b) measures to enhance Green Dot's marketing materials, disclosures, instructions, and similar documentation for consumer products and services to ensure that consumers receive material information in a manner that is accurate, clear, complete, and conspicuous;

(c) measures to minimize unfair or deceptive acts and practices risk, as reflected by consumer complaints, with respect to the provision of consumer products and services, including, but not limited to: the disclosure of information related to account balances; minimum monthly deposit requirements; account transfer limitations; geographic use restrictions; refund limitations; the maintenance of reasonable policies and procedures for customer identity verification, account closures, and negative account balance resolution; and the assessment of account fees;

(d) measures to enhance Green Dot's policies and procedures for:

(i) the review, approval, and maintenance of all materials documenting the service-level standards for services provided by third parties as well as their partners, servicers, vendors, and any of their providers or sub-servicers;

(ii) promptly addressing and resolving consumer complaints and regulatory inquiries arising in connection with consumer products or services with adequate levels and types of staff who have the requisite skills, knowledge, and abilities, monitoring such complaints and inquiries and identifying any trends concerning the nature of the complaints and inquiries, and promptly addressing the root causes of such complaints and inquiries, with a view to significantly reducing the volume of consumer complaints, as defined by Green Dot, to Green Dot and the San Francisco Reserve Bank, respectively, from the levels prior to this Order;

(iii) remediating consumers who are harmed by Green Dot's products or services or related misconduct, including requiring the issuance of prompt refunds; and

(iv) updating policies and procedures on an ongoing basis as necessary to incorporate new or changes to existing consumer protection laws and regulations;

(e) measures to ensure on-going, periodic training of appropriate Green Dot personnel, including the board of directors and senior management, that addresses compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act;

(f) measures to enhance the risk monitoring process and management information systems to identify, manage, and promptly correct consumer compliance weaknesses, including any weaknesses in compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act; and

(g) measures to enhance the internal controls for compliance with consumer protection laws and regulations, including section 5(a)(1) of the FTC Act.

**Assessment of Civil Money Penalty**

15. The Board of Governors hereby assesses Green Dot a civil money penalty in the amount of $44,000,000 which shall be paid upon the execution of this Order by Fedwire transfer

of immediately available funds to the Federal Reserve Bank of Richmond ABA No.051000033, beneficiary, Board of Governors of the Federal Reserve System. This penalty is a penalty paid to a government agency for a violation of law for purposes of 26 U.S.C. § 162(f) and 26 C.F.R. § 1.162-21. The Federal Reserve Bank of Richmond, on behalf of the Board of Governors, shall distribute this sum to the U.S. Department of the Treasury, pursuant to section 8(i) of the FDI Act (12 U.S.C. § 1818(i)).

**Approval, Implementation, and Progress Reports**

16. (a) The board of directors of the Holding Company and the Bank, as applicable, shall submit engagement letters, plans, and programs that are acceptable to the San Francisco Reserve Bank within the applicable time periods set forth in paragraphs 2, 3, 4, 5, 12, 13, and 14 of this Order. Each plan and program shall contain a timeline for full implementation with specific deadlines for completion of each component. Each plan and program shall also include and clearly identify any requirements under the applicable paragraphs that the Holding Company and the Bank, as applicable, previously submitted and were approved or not objected to by the Reserve Banks.

(b) Within 10 days of approval by the San Francisco Reserve Bank, the board of directors of the Holding Company and the Bank, as applicable, shall adopt the approved plans and programs. Upon adoption, the board of directors of the Holding Company and the Bank, as applicable, shall promptly implement the approved plans and programs and thereafter fully comply with them.

(c) During the term of this Order, the approved plans and programs shall not be amended or rescinded without the prior written approval of the San Francisco Reserve Bank.

17. Within 45 days after the end of the first full calendar quarter following the date of this Order and each quarter thereafter, the board of directors of the Holding Company and the Bank shall submit to the Reserve Banks consolidated written progress reports detailing the form and manner of all actions taken to comply with the provisions of this Order, a timetable, and schedule to implement specific remedial actions to be taken, and the results thereof. The San Francisco Reserve Bank may, in writing, discontinue the requirement for the progress reports, request modification of form or content, or modify the reporting schedule.

**Primary Contact**

18. Within 10 days of this Order, the Holding Company and the Bank shall designate officer(s) to be responsible for coordinating and submitting to the San Francisco Reserve Bank the engagement letters, plans and programs required under the terms of this Order.

**Communications**

19. All communications regarding this Order shall be sent to:

(a) Mongkha Pavlick
Senior Vice President
Federal Reserve Bank of San Francisco
101 Market Street
San Francisco, California 94105

(b) Emily Greenwald
Senior Vice President
Federal Reserve Bank of Dallas
2200 North Pearl Street
Dallas, Texas 75201

(c) Richard M. Ashton
Deputy General Counsel
Jason A. Gonzalez
Deputy Associate General Counsel
Board of Governors of the Federal Reserve System
Washington, DC 20551

(d) George Gresham
Chief Executive Officer and President
Green Dot Corporation
114 West 7th Street, Suite 240
Austin, Texas 78701

(e) Amy Pugh
General Counsel and Interim Chief Risk Officer
Green Dot Bank
1675 North Freedom Boulevard
Provo, Utah 84064

With a copy to:

(f) Richard K. Kim, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York, 10019

(g) Juan Azel, Esq.
Carl Fornaris, Esq.
Winston & Strawn LLP
200 South Biscayne Boulevard
Miami, Florida 33131

(h) John H. Cobb, Esq.
Winston & Strawn LLP
300 South Tryon Street, 16th Floor
Charlotte, North Carolina 28202

**Miscellaneous**

20. Notwithstanding any provision of this Order to the contrary, the San Francisco Reserve Bank may, in consultation with the Board of Governors, grant written extensions of time to the Holding Company and the Bank to comply with any provision of this Order. The Holding Company and the Bank must submit a written request to the San Francisco Reserve Bank for any extension of time.

21. The provisions of this Order shall be binding on the Holding Company and the Bank and each of their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the

FDI Act, as amended (12 U.S.C. §§ 1813(u) and 1818(b)(3)), in their capacities as such, and their successors and assigns.

22. Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Board of Governors.

23. Except as otherwise provided in this paragraph, the Board of Governors hereby agrees not to initiate any further enforcement actions, including for civil money penalties, against the Holding Company, the Bank, and their affiliates, successors, and assigns, with respect to the conduct described in the WHEREAS clauses paragraphs A. through E. above, to the extent known by the Board of Governors as of the effective date of this Order. This release and discharge shall not preclude or affect: (i) any right of the Board of Governors to determine and ensure compliance with this Order, including further proceedings brought by the Board of Governors necessary to remedy unsatisfactory implementation of required corrective actions; (ii) any proceedings brought by the Board of Governors to enforce the terms of this Order; or (iii) any proceedings brought by the Board of Governors against individuals who are or were institution-affiliated parties of the Holding Company or the Bank.

24. Except as provided in paragraph 23, the provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Banks, or any other federal or state agency from taking any other action affecting the Holding Company, the Bank, or any subsidiary thereof, or any of their current or former institution-affiliated parties and their successors and assigns.

25. Nothing in this Order, expressed or implied, shall give to any person or entity, other than the parties hereto and their successors hereunder, any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors of the Federal Reserve System effective as of the 19th day of July, 2024.

GREEN DOT CORPORATION

By: /s/ George Gresham
George Gresham
Chief Executive Officer and President

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

By: /s/ Ann E. Misback
Ann E. Misback
Secretary of the Board

GREEN DOT BANK

By: /s/ George Gresham
George Gresham
Chief Executive Officer and President

# EXHIBIT 2

EXHIBIT 2

# Press Release

July 19, 2024

## Federal Reserve Board takes action to address consumer compliance breakdowns by Green Dot, fining the firm $44 million for numerous unfair and deceptive practices and a deficient consumer compliance risk management program

For release at 1:30 p.m. EDT

**Share**

The Federal Reserve Board on Friday took action to address consumer compliance breakdowns by Green Dot, fining the firm $44 million for numerous unfair and deceptive practices and a deficient consumer compliance risk management program.

Green Dot violated consumer law in its marketing, selling, and servicing of prepaid debit card products, and its offering of tax return preparation payment services. For example, Green Dot failed to adequately disclose the tax refund processing fee for tax preparation services offered on a third party's website. The firm also blocked access to accounts of legitimate customers receiving unemployment benefits and lacked reasonable policies and procedures to help those customers cure those blocks. In addition, Green Dot did not maintain effective consumer compliance risk management and anti-money laundering programs.

The Board is requiring the firm to take several steps to improve these programs. Green Dot must hire an independent third-party to strengthen its consumer compliance risk management program and address the root causes of consumer complaints. The firm also must develop an effective anti-money laundering program and hire an independent third-party to conduct a review of certain transaction activities.

For media inquiries, please email media@frb.gov or call 202-452-2955.

Attachment (PDF)

### Related Content

Board Votes